**COASTAL STATES CRUDE GATHERING COMPANY et al., Appellants,**

v.

**Mrs. Ruby A. WILLIAMS et al., Appellees.**

**No. 640.**

Court of Civil Appeals of Texas, Corpus Christi.

Dec. 30, 1971.

Rehearing Denied Feb. 10, 1972.

Kleberg, Mobley, Lockett & Weil, Leslie S. Lockett, Corpus Christi, for Coastal States.

Dyer, Redford, Burnett, Wray, Woolsey & Dunham, Cecil Redford, Corpus Christi, for Pan Am Petroleum.

Edwards & DeAnda, William R. Edwards, Philip Maxwell, Corpus Christi, for Mrs. Williams and others.

Allison, Maddin, White & Brin, Guy Allison, Corpus Christi, Jon Newton, Wade & Traylor, Beeville, for Field Drilling.

## OPINION

BISSETT, Justice.

This is an oil field fatality case. The action arose out of an accident that occurred on March 18, 1969, when Demprey Williams, while operating a bulldozer, struck a pipeline, resulting in a rupture of the line, a spillage of oil and a fire that claimed his life. Appellees, Mrs. Ruby Williams (surviving wife of decedent) and Mrs. Billie Ramsey (sole child of decedent) filed suit against Coastal States Crude Gathering Company, Pan American Petroleum Corporation and Field Drilling Company (hereinafter called "Coastal States", "Pan Am" and "Field", respectively) for damages alleged to have been sustained by them as a result of the accident that caused decedent's death. The pipeline that was struck was owned by Coastal States. Field had contracted with Pan Am to drill a well at a location near the pipeline. C. H. Harris (hereinafter called "Harris") had contracted with Field to dig a water pit to be used in connection with the drilling of the well. Demprey Williams (hereinafter called "Williams") was an employee of Harris.

Traders & General Insurance Company, the insurance carrier for Harris, intervened to recover benefits it had paid under the Texas Workmen's Compensation Law. All defendants sought indemnity from each other. Coastal States filed a cross-action against Pan Am and Field for damages to its pipeline and for the value of the oil that was lost.

Trial was to a jury. Judgment was entered in favor of Mrs. Ruby Williams, Mrs. Billie Ramsey and Traders & General Insurance Co. in the total amount of $177,121.84 against Coastal States and Pan Am, with Mrs. Williams recovering $147,798.21, Mrs. Ramsey recovering $17,477.58, and Traders & General recovering $11,846.05. The jury awarded $25,000.00 for conscious physical pain and mental anguish suffered by Williams. All pleas for indemnity were denied. Statutory contribution as provided by Article 2212, Vernon's Ann.Civ.St., was ordered as to payment of the judgment by Coastal States and Pan Am. Coastal States was denied recovery of any damage sought by its cross-action. Pan Am has appealed that portion of the judgment denying it recovery for indemnity against Field. Coastal States has appealed the judgment in its entirety.

The accident, made the basis of this suit, occurred on a portion of the Mary Ellen O'Connor Ranch, in Refugio County, Texas, situated to the south of Farm-to-Market Road 774 and to the east of Farm-to-Market Road 2678. At that time the part of the ranch immediately to the south of FM 774 and east of FM 2678 was under oil and gas lease to Humble Oil & Refining Company; south of the Humble lease is a Pan Am oil and gas lease (where the accident occurred and hereinafter called the "O'Connor lease"); immediately south of and adjoining the O'Connor lease is Pan Am's oil and gas lease known as the El Oso Cattle Company lease (hereinafter called the "El Oso Lease").

A map or plat (not drawn to scale) is incorporated herein that shows the area be-

tween roads FM 2678 and FM 774 that is traversed by the 8″ and 10″ pipelines, the route and location, the location of Wells 10 and 3 and on the El Oso lease and of Wells 1, 2, 17 and 30 on the O'Connor lease, the main lease road across the leases, the lateral lease roads to the above numbered wells (except Well 30), the site of the accident, and the pipeline markers on roads FM 2678 and FM 774, as follows:

[A4973]

Two pipelines owned by Coastal States, an 8″ line and a 10″ line, cross the aforesaid portion of the ranch. The 8″ line is a high pressure gas transmission line that was built in 1942 by Sinclair and was purchased by Coastal States in 1964. The 10″ line is a crude oil transmission line that was constructed by Coastal States in the summer of 1965. Both lines are almost parallel and in close proximity to each other. Generally speaking, they were about 60 feet apart. They were about 14 feet apart at the spot where the lines entered the O'Connor lease from the south and were about 43 feet apart at the site of the accident. The 10″ line is east of the 8″ line.

The easement for the 10″ line was granted to Coastal States by Mary Ellen O'Connor on May 20, 1965. Pan Am acquired its oil and gas leases before May 20, 1965. On that date Wells 1 to 11 on the El Oso lease and Wells 1 to 23 on the O'Connor lease were then producing.

Until August, 1969, the employees of Pan Am who took care of the wells on both the El Oso and the O'Connor leases entered the O'Connor ranch at the "Humble Gate" on FM 774. They travelled the private Humble main lease road through the Humble lease to Pan Am's leases. Pan Am constructed its own system of roads on its leases. Lateral roads extended out from its main road to each producing well. There were no public roads on the ranch between FM 774 and FM 2678.

There were pipeline signs, painted fence posts and vent pipes (installed and maintained by Coastal States) at the places where both the 8″ and the 10″ pipelines entered and exited that portion of the ranch bound by FM 2678 on the east and by FM 774 on the north. These markers were on both sides of the roads and were plainly visible to anyone travelling thereon. Coastal States did not have any pipeline markers, painted fence posts or vent pipes at any place on either of the O'Connor or El Oso leases, though it did have a cathod-ic protection test lead on the El Oso lease near the common boundary between these two leases. The 8″ line was marked by Coastal States in several places where it crossed some of Humble's lateral lease roads. Pan Am's employees did not know of the markings on these Humble lease roads.

It is approximately 19,000 feet from the point where the two pipelines cross FM 2678 to the place where they intersect FM 774. It is some 3,500 feet across the El Oso lease, about 4,500 feet across the O'Connor lease and approximately 9,000 feet across the Humble lease. The site of the accident is about 1,000 feet south of the north line of the O'Connor lease, about 1,500 feet east of the west line of the lease, and about 3,500 feet north of the common boundary between the O'Connor and the El Oso leases. There were no lateral roads leading west from Pan Am's main lease road to the area of Well 30 until a few days before the accident when a road was built to the staked location.

Well 30 was staked by Lester Cole, Pan Am's surveyor, at a point 125 feet east of the 8″ line. The 8″ line was flagged by him. Both the stake marking the well location and the flag marking the 8″ pipeline were pointed out to Mr. Edwards, the tool-pusher for Field, by Mr. Davlin, Pan Am's field foreman, on the morning of the accident. The location of the water pit, which was to be used in drilling the well, was then selected by Edwards. Williams, in the presence of both Davlin and Edwards, outlined the perimeter of the pit on the ground by use of his bulldozer's blade. No one suggested a different location for the pit. Davlin stated that he did not know that the 10″ line was in the area. Neither Edwards, Harris nor Williams knew of the existence of the 10″ line. The location of the water pit was over the 10″ line. At that point, the 10″ line was 43 feet east of the 8″ line and was buried to a depth of about 42 inches below ground level. In digging the pit, the blade of the bulldozer struck the 10″ line, causing a rupture in

the line. Oil spilled in the excavation and on the bulldozer. The oil ignited, Williams was set afire and died about one minute thereafter.

■ We shall first consider Pan Am's appeal, which is predicated on seven points of error. The first point assigns as error the overruling by the trial court of Pan Am's motion to disregard and set aside the jury's finding (special issue 13) that a pumper, field foreman or area foreman of Pan Am knew the route and location of the 10″ pipeline on the O'Connor lease at any time before the accident. It argues that there is no evidence to support this fact finding. We do not agree.

The jury found that Pan Am knew of the existence, route and location of the 10″ pipeline on the O'Connor lease. It further found that the failure of Pan Am to give Williams any adequate and proper warning of the location of the 10″ pipeline and the failure to provide him with a reasonably safe place to work were each a proximate cause of the accident. There are also findings that Pan Am failed to exercise proper care to preserve such information about the 10″ pipeline for later use, and that this was a proximate cause, but not the sole proximate cause, of the occurrence in question.

According to Pan Am's standard operating procedure, each pumper was required to report to his field foreman anything that happened on the lease, and, in turn, each field foreman was required to report such occurrences to his area foreman, who was then required to transmit such information through channels to the "title survey" department of Pan Am, where notation thereof would be made. No one connected with Pan Am made any report to his immediate superior of any activity at any time on either the O'Connor or the El Oso lease incidental to Coastal States' 10″ pipeline route, location or construction across these leases.

In August and September 1965, an independent contractor for Coastal States built that section of the 10″ line across the O'Connor ranch and in particular across the leases of Humble and Pan Am, as shown on the above map. The surveying crew (sometime prior to August 11, 1965) staked the route by installing states with ribbons or flags attached at approximately 100-foot intervals along the route. The brush on the O'Connor lease was cut to the ground and the ground was scraped bare. The actual pipeline construction work on the O'Connor and El Oso leases (stringing of pipe down the right-of-way, welding of pipe, ditching, lowering of pipe into the ditch, and backfilling operations) was performed by different crews of men and machines on August 11, 12, 13, 30 and 31, and on September 1 and 2 of 1965. The construction crew consisted of from 100 to 150 men, who, in varying numbers would, at times be spread over a distance of three or four miles. The El Oso lease was a plowed field and the O'Connor lease was in light brush. The construction area, according to several witnesses, varied from 40 to 80 feet in width. The path of the construction across the O'Connor lease was straight. There were no visual obstructions and there was nothing to prevent a person at the intersection of Pan Am's main lease road with the pipeline route from seeing all the way across the O'Connor lease. After such construction was completely finished, the raw dirt and a lesser amount of vegetation on the scraped area of the right-of-way as contrasted with either side of the construction route evidenced pipeline construction. This condition existed for months after completion of the pipeline.

J. B. Mascorro, the ranch foreman of the Mary Ellen O'Connor Ranch, knew the route and location of both the 8″ and the 10″ lines. He remembered the construction of the 10″ line. He testified that both lines were confined to a strip about 60 feet wide that crossed that section of the ranch south of FM 774 and east of FM 2678.

In servicing several of the wells on the leases, it was necessary to cross both the

8″ and the 10″ pipeline. The main lease road crossed both lines. Pan Am's pumpers (W. E. Cloud or a relief pumper) made daily trips to each producing well. Pan Am, in its motion to set aside the findings of the jury, admitted that Cloud, the pumper on the leases, crossed the route of the 10″ pipeline daily while it was being constructed and had knowledge that a pipeline was being constructed across the lease road. It contended, however, that Cloud would not have knowledge of the route and location of the 10″ pipeline at the place where the accident occurred. It further admitted that Mr. Arnold, its field foreman at the time the 10″ line was built, knew that a pipeline had been constructed across the leases but he did not have any idea as to its route and location.

In Hexter v. Pratt, 10 S.W.2d 692 (Tex.Com'n App.1928), it was said:

"Notice in law is of two kinds—actual and constructive. * * * In common parlance 'actual notice' generally consists in express information of a fact, but in law the term is more comprehensive. In law whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained. Means of knowledge with the duty of using them are in equity equivalent to knowledge itself. * * * So that, in legal parlance, actual knowledge embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed."

Hexter v. Pratt, supra, was cited with approval by the Supreme Court in Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286, and in Champlin Oil & Refining Company v. Chastain, 403 S.W.2d 376 (Tex. Sup.1966), in which latter case, the Supreme Court, at page 388, stated:

"It has been determined by Texas authority that imputed actual notice carries with it the same legal consequences as conscious knowledge."

In Lackey v. Gulf, C. & S. F. Ry. Co., 225 S.W.2d 630, 632 (Tex.Civ.App.—Austin 1949, n. w. h.), the Court observed:

"One may not claim the right to recover, because he has looked and did not see, if the conditions are such that had he looked he must have seen".

The same principle, logic and reasoning applies here. See also Waring v. Harris, 221 S.W.2d 345 (Tex.Civ.App.—Austin 1949, writ ref'd); Missouri Pacific Railroad Company v. Dean, 417 S.W.2d 357 (Tex.Civ.App.—Tyler 1967, writ ref'd n. r. e.). Pan Am knew the exact route and location of the 8″ line. It is shown on their map. The route and location of the 10″ pipeline was fully exposed on the ground for the employees of Pan Am to see. They had the means at hand to determine the route and location of the new line. There is no evidence of the pipeline angling, changing direction or veering from the course that it was on when it left either the Humble lease or the El Oso lease and entered the O'Connor lease. The places of entry into and exit from the O'Connor lease on both its north and south lines were plainly visible at the spot where the main lease road crossed the 10″ line on the El Oso lease. The line was straight. The conditions were such that had Pan Am's employees looked from that point across the O'Connor lease they must have seen the route and location of the line.

With respect to "no evidence", we are required to consider only the evidence and inferences favorable to the jury findings and to disregard all evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821 (Tex.Sup.1965). We are without authority to disregard the jury findings in response to special issues where there is some evidence in the record to support them. Singer v. Singer, 150 Tex.

115, 237 S.W.2d 600 (1951); Garza v. Anderson, 417 S.W.2d 368 (Tex.Civ.App.— Corpus Christi 1967, n. w. h.). We have reviewed the record in the light most favorably in support of the jury's answers to these special issues. The answers are fully supported by the evidence. Pan Am's first point is overruled.

■ With respect to point two, Pan Am argues that special issue 14 "encompasses both failure to preserve information and negligence in one issue". No objection was made to that effect in the trial court and no such objection has been preserved for appellate review.

■ Pan Am also contends that failure to preserve the information would not be a proximate cause and says that the accident was the result of Williams striking the 10″ line. We do not follow that argument. In our opinion the jury was justified in finding that Pan Am's failure to preserve for later use the information open and available to its employees concerning the route and location was a proximate cause of the accident. Cole, the surveyor, testified that if the existence of the 10″ line had been reported to his office he would have spotted it on Pan Am's map. Davlin, the field foreman for Pan Am on the date of the accident, said that if the 10″ line had been shown on the map he would have told Harris and Williams about it, that he expected Harris, Williams and Field to rely on what he told them about the existence and non-existence of pipelines, and that he wouldn't expect them to be looking around for other pipelines. Harris stated that he relied on Davlin's assurance that there was but one line. Joe Russell, Pan Am's area foreman on the date of the accident, testified that if he had known of the 10″ line he would have told Harris and Field's representative about it because he would want to point out a hazard. Consequently, Pan Am's not having preserved the information about the 10″ pipeline for later use resulted in Cole's not having the information when he staked the location for Well 30, which pre-

vented him from advising Davlin of the existence of the 10″ line, which resulted in Davlin's not advising Field, Harris and Williams of the line. Certainly, the preservation of the knowledge of the route and location of the 10″ line would have prevented the accident. Failure to preserve such information was a proximate cause of the occurrence. Furthermore, Pan Am does not attack the judgment in favor of plaintiffs and intervenor against it. Pan Am appeals only from that part of the judgment that denied it recovery against Field. Pan Am's second point is overruled.

We next consider Pan Am's remaining points of error. Points three through six complain of the refusal by the trial court to allow Pan Am a recovery for contractual indemnity against Field. Point seven asserts error in the submission of special issues 18 through 24, wherein Pan Am contends that none of such issues if answered in the affirmative would, under the law, constitute a defense to its cause of action for contractual indemnity against Field.

■ A master drilling contract was entered into by and between Field, as contractor, and Pan Am, as owner, on March 1, 1962. Article 5(c) of that contract provided:

"Contractor shall assume full liability for, and shall hold Pan American harmless against all claims whatsoever arising as a result of blowouts, explosions or accidents incident to drilling operations conducted by Contractor hereunder while operations are on a footage basis."

Pan Am contends that the above Article of the master drilling contract provides for indemnity for accidents arising out of its own negligence. Field argues the contrary.

In Mitchell's Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775 (1957), the Supreme Court discussed the rule that in this State an indemnity agreement will not protect the indemnitee against the consequences of

his own negligence unless the obligation is expressed in unequivocal terms. It noted, however, that it was not necessary for the parties to say, in so many words, that they intended to save the indemnitee harmless from liability for his own wrongs, but it is necessary for that intention to clearly appear when all provisions of the contract are considered in the light of the circumstances surrounding its execution. Such an indemnity provision as is contained in the contract between Pan Am and Field is usually inserted in the drilling contract primarily to protect the owner-lessee against loss or liability resulting from operations, physical conditions, or contingencies over which it has no control and which are generally under the control and supervision of the drilling contractor.

It was observed by the Supreme Court in Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631 (Tex.Sup.1963):

"Ordinarily, however, one does not contract against the results of his own negligence. Such agreements, except for insurance contracts, must be regarded as exceptional rather than usual in the majority of business transactions. Before such indemnity contracts may be enforced it must clearly appear that the contracting parties intended that the indemnitor would be held liable for damages resulting from the negligence of the indemnitee".

By providing for indemnity for damages "incident to drilling operations conducted by Contractor hereunder", the owner (Pan Am) has protected itself against liability for injuries which might be proximately caused by the negligence of the contractor (Field), but not against liability for injuries which might be solely caused by its negligence or by the concurrent negligence of itself and a third party. We believe that the language used in the indemnity provision in the contract before us places the instant case in the same category with Westinghouse Electric Corp. v. Childs-Bellows, 352 S.W.2d 806 (Tex.Civ.App.—Ft. Worth 1961, writ ref'd); Sinclair Oil & Gas Co. v. Brown, 333 F.2d 967 (10th Cir. 1964); Standard Oil Co. of Texas v. Wampler, 218 F.2d 768 (5th Cir. 1955). These cases hold that when the contractual obligation may reasonably be said to require indemnity for damages proximately caused by acts or conduct of a subcontractor (contractor) in the performance of his work, the contract will not be held to require indemnity for injuries which are proximately caused solely by the negligence of the general contractor (owner).

In support of its contention that the quoted provision authorizes a recovery against Field for contractual indemnity, Pan Am relies on Ohio Oil Company v. Smith, 365 S.W.2d 621 (Tex.Sup.1963), and Spence & Howe Construction Co. v. Gulf Oil Corporation, 365 S.W.2d 631 (Tex.Sup.1963). In each of these cases, the agreement to indemnify was much broader than the agreement in the instant case. In *Ohio Oil,* the contractor agreed to indemnify Ohio against "all claims and damages . . . *arising out of or attributed, directly or indirectly, to the operations of Contractor hereunder".* In *Spence & Howe,* the contractor agreed to indemnify against "all claims arising . . . *in connection with such work".* Under the broad indemnity agreement in the cited cases, the Supreme Court held that the contractor was required to indemnify the indemnitee against damages incurred as a result of its own negligence. The indemnity provision in the instant case is much narrower than the provisions in the cited cases. Here, the provision is limited to "claims whatsoever arising . . . *incident to drilling operations conducted by Contractor . . . ."* The contractual obligation, thus limited, provides for indemnity only for damages caused by acts or conduct by Field in the performance of its work. It does not afford indemnity for damages caused by a negligent act of the indemnitee (Pan Am) in connection with the work. Compare City of Beaumont v. Graham, 441 S.W.2d 829 (Tex.Sup.1969).

The latest case on the subject of contractual indemnity is the very recent case of Joe Adams & Son v. McCann Construction Company, Tex., 475 S.W.2d 721, opinion delivered on October 6, 1971. There, McCann Construction Company was the general contractor and indemnitee, and Joe Adams & Son was the subcontractor and indemnitor. McCann built wooden forms extending some eighteen or twenty feet above the ground level into which forms employees of Adams were to pour concrete. While pouring the concrete, the forms collapsed and three of Adams' employees were injured. They recovered damages against McCann upon jury findings that certain acts and omissions by McCann in connection with the construction and use of the forms constituted negligence and proximate causes of the injuries. McCann then sued Adams for contractual indemnity; its right to indemnity turned on the interpretation of their contract, and in particular upon a portion of Article VIII thereof, reading as follows:

"The Contractor shall protect, indemnify and save McCann Construction Company, Inc., and Owner harmless from any and all claims, suits and actions of any kind or description, for damage or injuries to persons or property received or sustained by any party or parties through or on account of any act or in connection with the work of the Contractor or its agents or servants. . . ."

McCann claimed that the work being performed at the time of the injuries was that of pouring concrete, that the forms were constructed for Adams to pour concrete into, that the contract could not be performed without the forms, and that the filling of the forms by Adams' employees was the immediate cause of their collapse. McCann argued that the injuries were sustained "through or on account of an act or in connection with the work" within the meaning of the contract. The Supreme Court rejected that argument and said:

". . . We do not agree. McCann's liability arises from the fact that the accident was proximately caused by its own want of care, and there is no suggestion that Adams or anyone under its supervision or control was at fault in any way. We thus have a casualty that would not have occurred but for the negligence of the indemnitee and to which the indemnitor contributed in no way except by doing its work in a careful and prudent manner".

Mr. Justice Walker, who wrote the majority opinion, after reviewing *Ohio Oil, Spence & Howe,* and *Mitchell's Inc.,* in determining the effect of the indemnity clause in *McCann,* said:

". . . [an owner or] general contractor who wishes to be protected against liability for damage caused solely by his own negligence must arrange for the obligation to be expressed in clearer terms than those used in the agreement now in question."

The fact that Coastal States was also convicted of negligence that proximately caused the accident does not affect the issue of contractual liability between Pan Am and Field. As between them, the contracting parties, the accident was caused by the sole negligence of Pan Am. There is no sound basis for holding that the contract of indemnity will indemnify Pan Am simply because its negligence concurs with that of Coastal States, a third party, as a proximate cause of the accident. Compare Humble Oil & Refining Co. v. Wilson, 339 S.W.2d 954 (Tex.Civ.App.—Waco 1960, wr. ref'd n. r. e.). The question to be resolved is whether it was the intention of the parties, as expressed by the language employed in their contract, that the indemnitee would be protected from the consequences of his own negligence.

There was no suggestion that Field or anyone under its supervision or control was at fault in any way. Pan Am's liability arises from the fact that the accident was proximately caused by its own want of care. The location of the water pit over the 10″ line had the tacit approval of Pan

Am. As between indemnitor and indemnitee, the accident would not have occurred but for the fault of the indemnitee and to which the indemnitor did not contribute, but, instead, performed its work in a careful and prudent manner and in complete reliance upon representations made by the indemnitee. We hold that the contract between Field and Pan Am, when considered in the light of the circumstances surrounding its execution, does not evidence an intent of the parties to indemnify Pan Am against the consequences of its own negligence. Joe Adams & Son v. McCann Construction Company, supra; Westinghouse Electric Corp. v. Childs-Bellows, supra; Sinclair Oil & Gas Co. v. Brown, supra; Standard Oil Co. of Texas v. Wampler, supra. Accordingly, Pan Am's points three through seven, each having been carefully considered, are each overruled.

■ We next consider Coastal States' appeal. Point one complains of the judgment entered in favor of plaintiffs and intervenor against Coastal States.

The jury found that Coastal States failed to give such warnings of the route and location of its 10″ pipeline on the O'Connor Ranch as would have been given by a reasonably prudent pipeline company in the exercise of ordinary care under the same or similar circumstances, and that such failure was a proximate cause, but not the sole proximate cause, of the accident. It was on these findings that plaintiffs and intervenor recovered judgment against Coastal States. The findings by the jury are not challenged by "no evidence" or "factual insufficiency" evidence points. Coastal States does not argue that such failure was not a proximate cause of the accident.

There is evidence that it is the custom of the industry for signs and markers to be placed on interior fence lines and interior lease roads that cross the route of a pipeline. Coastal States did not install any such sign at any such place on either the O'Connor or the El Oso leases. The only

warning signs on the ranch of the 10″ pipeline were, as already stated, at the places where the line crossed FM 2678 and FM 774.

Coastal States relies heavily on Delhi-Taylor Oil Corp. v. Henry, 416 S.W.2d 390 (Tex.Sup.1967), in support of its point one. It contends that whatever duty it owed Williams was completely discharged by Pan Am's knowledge of the presence, location and route of the 10″ pipeline. We do not agree. The fact situation in *Delhi-Taylor* is not analogous to this case. The contractor who was performing the work for Pan Am had neither knowledge nor warning of the existence of the 10″ pipeline. There was no privity between Coastal States and Pan Am or between Coastal States and Field or Harris. We do not believe that *Delhi-Taylor* is controlling of this point. Therefore, Coastal States' point one is overruled.

■ Coastal States, by its point two, asserts that the trial court erred in not awarding it indemnity against Pan Am. It argues that in the event it is held liable to the plaintiffs and intervenor that it is entitled to common law indemnity against Pan Am rather than statutory contribution. Under Article 2212, V.A.C.S., enforced contribution is allowed among joint tortfeasors who are in pari delicto with each other. Gulf, Colorado & Santa Fe Railway Co. v. Bliss, 368 S.W.2d 594, 597 (Tex.Sup.1963). The common law denied contribution among joint tortfeasors, subject, however, to an exception where the tortfeasors did not stand in pari delicto (in equal fault) with each other. In such instances the common law allowed indemnity. Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1950).

Much has been written on the subjects of common law indemnity and statutory contribution and it is not necessary for us to write on the development of the law in these fields. Our Supreme Court has formulated certain rules by which we are to be guided in determining whether indemni-

ty under the common law or statutory contribution is to be allowed. These rules and the various tests to be applied are fully set out in City of San Antonio v. Smith, 94 Tex. 266, 59 S.W. 1109 (1900); Oats v. Dublin Nat. Bank, 127 Tex. 2, 90 S.W.2d 824 (1936); Wheeler v. Glazer, 137 Tex. 341, 153 S.W.2d 449 (1941); Austin Road Company v. Pope, 147 Tex. 430, 216 S.W. 2d 563 (1949); Humble Oil & Refining Co. v. Martin, 148 Tex. 175, 222 S.W.2d 995 (1949); and Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1950).

The above cases were reviewed in Strakos v. Gehring, 360 S.W.2d 787 (Tex.Sup. 1962). The analysis made therein by the Supreme Court discloses that there are three approaches that have been used to determine whether or not a given fact situation establishes the right to common law indemnity between joint tortfeasors, as distinguished from the right to statutory contribution. One approach is based on "active versus passive" negligence, one on "different qualities" of negligence, and the other on "breach of duty". Where the facts qualify under any one of the three approaches, the Supreme Court has consistently held that the case was one of common law indemnity and not one of contribution. The adjudicated cases have laid down the tests to be applied.

The "active versus passive" negligence test was announced in City of San Antonio v. Smith, supra, and has been followed in many cases, including Austin Electric R. Co. v. Faust, 133 S.W. 449 (Tex.Civ.App. 1911, writ dism'd), where one party by his negligence brought on a condition and another party was negligent in not recognizing and acting on such condition, and a third party, without negligence, was injured by reason of the joint negligence of the tortfeasors. The Court held:

". . . In such case, the negligence of both of the parties is the proximate cause of the injury to the innocent party. But as to the two negligent parties, if the negligence of one was merely passive, or was such as only to produce the

occasion, and the other negligent party was the active perpetrator of the wrong, the former may recover over against the latter. As between the two negligent parties, the negligence of the active perpetrator of the wrong would be the proximate cause of the injury to the party whose negligence did no more than produce the condition. . . ."

The Court's views upon "active versus passive" negligence were clearly upheld in Valee v. Joiner, 44 S.W.2d 983 (Tex. Com'n App. 1932), and in Oats v. Dublin Nat. Bank, supra, where it was said:

". . . Aside from the statute, it is held in negligence cases that, where two persons are liable to another for tort, the active wrongdoer should indemnify the one whose wrong is only passive. . . ."

Pan Am, in its brief, states that the theory of common law indemnity, based on "active versus passive" negligence has now been abandoned by our Supreme Court. We do not believe that to be the case. The courts of this State have advanced varied reasons for allowing indemnity in a fact situation where the tort of one tortfeasor against another tortfeasor is distinct and independent from any tort which may have been committed by both against a third party. The courts have often referred to the approach "difference in quality of negligence" and "active versus passive negligence" as being separate and distinct. Actually, they are so interrelated as to be virtually insusceptible of categorization into two separate approaches. Be that as it may, our Supreme Court as late as 1962 when it decided Strakos v. Gehring, supra, listed the "active versus passive" negligence approach as one to consider in determining whether common law indemnity is allowable in a particular case.

Concerning the "different qualities" of negligence approach, the Supreme Court, in Wheeler v. Glazer, supra, held:

". . . Thus, where the parties are shown not to have been equally guilty,

the principal delinquent may be held responsible to a co-delinquent for damage paid by reason of the offense in which both were concerned in different degrees as perpetrators."

The "breach of duty" approach was followed by the Supreme Court in Renfro Drug Co. v. Lewis, supra, wherein it was said:

". . . Where the injury forming the basis for the judgment against the joint tort-feasors results from a violation of a duty which one of the tort-feasors owes to the other, the latter, at common law, is entitled to contribution or indemnity from the former. . . ."

In Austin Road Co. v. Pope, supra, the Supreme Court said that the proper approach to consider in determining "whether the loss should be shifted from one tortfeasor to another the proper approach is to consider the one seeking indemnity as though he were a plaintiff suing the other in tort, and then determine whether such a one as plaintiff, though guilty of a wrong against a third person, is nevertheless entitled to recover against his co-tortfeasor". The Court, in determining the applicability of the "breach of duty" test, further stated:

"Consequently, as between themselves, either tortfeasor here involved may recover full indemnity against his co-tortfeasor if it appears that he has violated no duty toward him".

Professor Hodges, in 26 Tex.L.Rev. 150–173, "Contribution and Indemnity Among Tortfeasors", suggests that the following affords a workable rule for the courts to follow:

"When there are two tortfeasors, either or both of whom are liable to an injured third person, but one of whom has breached a duty which he owed both to his co-tortfeasor and to the injured third person, then the tortfeasor who, to his co-tortfeasor, is blameless, should be allowed indemnity."

It is our opinion that Coastal States is entitled to indemnity from Pan Am under the common law. Coastal States was lawfully using the premises within its designated easement. Under the oil and gas lease owned by Pan Am and under the easement owned by Coastal States, each had a right to conduct operations on the premises necessary for the proper use and enjoyment of their respective property rights. Neither had a right to so conduct any operations that might endanger the property of the other.

The evidence and jury findings convict both Coastal States and Pan Am of wrongful conduct that brought about the accident. However, Coastal States and Pan Am did not stand in pari delicto with each other. Coastal States created a condition that was potentially dangerous to the unwary or to the uninformed, but no injury would have resulted but for the active negligence of Pan Am. Coastal States' negligence was purely passive. Pan Am's actual knowledge of the conditions existing, coupled with its activity, directly and actively caused the accident. Coastal States and Pan Am were not acting in concert. Coastal States' negligence consisted of a single act of omission, the failure to warn of the route and location of the 10″ pipeline on the ranch, which was not the sole proximate cause of the accident. Coastal States knew nothing about the staking of the location by Pan Am for the drilling of Well 30. On the other hand, it is undisputed that Pan Am selected the well site for Well 30. Pan Am's duly authorized representative was present when the water pit was marked off on the ground. It consciously permitted the pit to be dug at such location. No one connected with Coastal States was in the vicinity of the well location when the pit was being dug. Pan Am was in complete control of the situs of the accident. In addition to the jury findings adverse to Pan Am, already set out, the jury also found that Pan Am represented to Field that it was safe for Williams to dig the pit at the location in question and

that such representation was negligence that proximately caused the accident.

Furthermore, Coastal States and Pan Am were not guilty of the same quality of negligence towards Williams. The evidence establishes varying degrees of negligence on the part of each. Again considering the jury findings and the facts as already related, a comparison of the conduct of Pan Am with that of Coastal States reveals that Pan Am's negligence is the more culpable and certainly the greater in quality. See 30 Tex.Jur.2d, Indemnity, § 9, pp. 453–454.

Pan Am argues that Coastal States breached a duty it owed it by not notifying it (Pan Am) of the route and location of the 10″ pipeline. This duty had been discharged. As stated, the jury found that Pan Am knew of the existence and of the route and location of the 10″ pipeline at the time of the occurrence in question. Therefore, Coastal States, as a matter of law, was under no duty to warn Pan Am of what was already known to it. McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954). Coastal States breached no duty to Pan Am. On the other hand, the evidence and fact findings by the jury show that Pan Am, under the circumstances noted, by allowing the pit to be dug at a place over the pipeline, was actively responsible for the striking and breaking of Coastal States' pipeline. Clearly, as between them, this amounted to a breach of duty that Pan Am owed Coastal States. All requirements of the "breach of duty" test are met by Coastal States because: (a) it was not in pari delicto with Pan Am; (b) it could properly be aligned as a plaintiff in an action against Pan Am to recover damages resulting from the puncture of its pipeline; and (c) it did not violate any duty that it owed Pan Am.

We conclude that Coastal States is entitled to full common law indemnity against Pan Am. Accordingly, Coastal States' point two is sustained.

■ Coastal States' third point complains of the jury's answer to the damage issue on its cross-action against Pan Am. Special issue 28 asked the jury what amount of money, if any, would fairly and reasonably compensate Coastal States for its damages, if any, proximately resulting from the occurrence in question. The jury answered "None". The record shows that Coastal States repaired the pipeline at considerable expense. There was testimony that a large number of barrels of oil, reasonably worth $3.4981 per barrel, belonging to Coastal States, was lost. We have examined the evidence which would support a judgment for some amount of money. Without further discussion, we hold that the answer of the jury to special issue 28 is so against the weight and preponderance of the evidence as to be manifestly wrong and unjust. Lowery v. Berry, 153 Tex. 411, 269 S.W.2d 795 (1954); Gallegos v. Clegg, 417 S.W.2d 347 (Tex.Civ.App.— Corpus Christi 1967, writ ref'd n. r. e.). Coastal States' point three is sustained.

We have considered Coastal States' remaining points of error and they are each overruled.

■ Field has brought forward two cross points, (a) that the trial court erred in refusing to admit into evidence the master drilling contract that was executed in November 1969, between Pan Am and Field, and (b) that the trial court erred in overruling Field's objection to special issue no. 17. Neither has merit. The contract was inadmissible because the rights of Field and Pan Am are governed by the contract executed by them on March 1, 1962, not by the provisions of the contract executed by them in November, 1969, after the date of the accident. The objection to the submission of special issue no. 17 was not preserved for appellate review. The record does not show that the objection was presented to the trial judge so that he could endorse his ruling and official signature thereon, as is required by Rule 272,

**353**

Texas Rules of Civil Procedure. Both cross points are overruled.

The judgment of the trial court is affirmed as to those portions which grant recovery to Ruby Williams, Mrs. Billie Ramsey and Traders & General Insurance Company against Coastal States Crude Gathering Company and Pan American Petroleum Corporation, jointly and severally. The judgment is also affirmed as to that portion that denies Pan American Petroleum Corporation any claim for contractual indemnity over and against Field Drilling Company. The judgment as to the portions that grant Coastal States Crude Gathering Company and Pan American Petroleum Corporation contribution each against the other and that portion that denies Coastal States Crude Gathering Company common law indemnity against Pan Am is reversed, and judgment is here rendered that Coastal States Crude Gathering Company shall have and recover of Pan American Petroleum Corporation any and all sums of money that it may be compelled to pay to Ruby Williams, Mrs. Billie Ramsey and Traders & General Insurance Company by virtue of the judgment of the trial court. The judgment as to that portion that denies Coastal States Crude Gathering Company indemnity against Field Drilling Company and a recovery on its cross-action against Field Drilling Company is affirmed. The judgment as to that portion that denies Coastal States Crude Gathering Company recovery on its cross-action asserted against Pan American Petroleum Corporation is reversed; the cross-action is severed from the remainder of the case and is remanded to the trial court for a new trial. Costs of this appeal are assessed against Pan American Petroleum Corporation.

Affirmed in part, reversed and rendered in part, and reversed and remanded in part.

SHARPE, J., not participating.