## RETAILERS' FIRE INS. CO. v. JACKSON GIN CO. (No. 3084.)

Court of Civil Appeals of Texas. Amarillo.
Oct. 10, 1928.

Rehearing Denied Nov. 21, 1928.

HALL, C. J. The appellee in this case has not favored us with a brief, and under Court of Civil Appeals rule No. 41, we will adopt the statement of the nature and result of the suit made by appellant, which is as follows:

By its original petition, the Jackson Gin Company alleged that on October 20, 1926, it was, and for some time had been, the owner of a certain gin situated in Groom, Tex.; that at all of such times, the defendant maintained an insurance agency in Shamrock, Tex., known as the Sherwood Agency, of which one Ben Wooten was a partner and was the duly authorized agent of the defendant to enter into contracts of insurance against loss by fire; that the defendant, through such agency, carried a policy on plaintiff's property in the amount of $3,000 for the year, which ended on October 20, 1926; that a short time before this policy expired, the plaintiff, acting through J. H. Jackson, its president, entered into an oral contract with the defendant, through its agent, Ben Wooten, by the terms of which the defendant agreed to insure the gin property for a period of one year from October 20, 1926, against loss by fire, in the amount of $3,000, so that if the property were burned during the year the plaintiff would receive $3,000, according to the stipulations and conditions contained in the policy, which was in force during the year ending on October 20, 1926, by reason of which the defendant became bound to pay such sum in the event the plaintiff's property was destroyed by fire during the time mentioned.

The defendant failed to issue this policy, though it had promised plaintiff so to do, and represented to plaintiff during the year 1927 that the policy had been issued and was in force and effect until October 20, 1927; that the insurance agency and Wooten had, for many years, retained the plaintiff's policies; that the plaintiff relied upon the promises of the defendant through said agent to renew the policy, and relied upon the representations that the policy had been renewed; that said agent failed to issue any policy for the year beginning October 20, 1926; that the statements made to the plaintiff that this policy had been issued were untrue; that by reason of the facts alleged, a valid, oral contract was entered into between plaintiff and defendant to the effect that the defendant, in consideration of the premium charged, would pay plaintiff $3,000 in the event his property was destroyed by fire at any time up to October 20, 1927, according to the terms of the policy which expired on October 20, 1926; that on July 31, 1927, all of this gin property was destroyed by fire, as a result of which plaintiff sustained a loss of $3,000; that under the contract of insurance entered into verbally between the plaintiff and defendant by reason of the destruction of this property by fire, the defendant became bound to pay plaintiff this sum of $3,000, which it has refused to do, for which plaintiff prayed judgment.

The defendant answered by general denial,

and specially pleaded that portion of the policy relating to a cancellation of it, providing that it might be canceled by giving notice; that it never had any contract or agreement or policy outstanding or in force or delivered to the plaintiff at the time of the fire complained of by plaintiff, and, if it should be mistaken in this, that any contract or agreement or policy that it might have had with the plaintiff was canceled before the fire complained of by the plaintiff, or expired according to its terms before the fire; and that, at the time of the fire, it did not have in force or effect any such contract or agreement or policy as insures the property against the loss or damage by fire for which plaintiff sues.

Defendant further pleaded in the alternative that if it had any such policy as the plaintiff claimed, its liability thereunder would be no more than that proportionate part of the loss sustained as a result of the fire than its policy bears to the total insurance held by the plaintiff at the time of the fire, and that if any liability should be found to exist against it that liability should be limited to its pro rata part of the same, applying to each of the items upon which the plaintiff claims a loss and damage; that Ben Wooten named as its agent by plaintiff was not its agent, and had no power to do or perform the things mentioned by plaintiff in plaintiff's petition.

Special issues were submitted to the jury, which, together with their answers, we state as follows:

(1) J. H. Jackson had an agreement and understanding with Wooten that he (Wooten) would renew the $3,000 policy in question in this case in the Retailers' Fire Insurance Company.

(2) Wooten had apparent authority as agent for the defendant company to make such an agreement.

(3) That Jackson relied upon the statements of Wooten, if any were made, that such insurance policy would be issued.

The court instructed the jury that the phrase "apparent authority of an agent" is that which, though not actually granted, the principal knowingly permits the agent to exercise or hold him out as possessing.

Based upon this verdict, the court rendered judgment in favor of the plaintiff for the sum of $2,700, with interest from August 1, 1927, at 6 per cent.

Numerous propositions are urged by the appellant, but in order to dispose of the case it will not be necessary for us to consider them in detail.

The first contention is that Wooten, the agent who appellant claims promised to renew the policy theretofore existing in the Retailers' Fire Insurance Company, was the agent of the gin company, or at most was, as to the appellee company, a broker or the joint agent of appellant and appellee. The

testimony in the record with relation to this matter is shown by the evidence of Wooten and of Jackson. Wooten testified in part as follows:

"My name is Ben Wooten. I live at Shamrock, Texas, where I have lived for 17 years. I am in the insurance business. The name of that business is W. J. Sherwood Agency. I have owned it since January 1st, 1927. * * * The agency carried insurance for J. H. Jackson and the Jackson Gin Company. Mr. Sherwood, when he was in the business, handled the transactions with the Jackson Gin Company and Mr. J. H. Jackson. After Sherwood got sick, I did. The Retailers Fire Insurance Company had insurance on the Jackson Gin Company's gin at Groom, Texas, for the year beginning October 20th, 1925; the policy was originally for $3,-000.00 and was reduced to $2,500.00. * * * The Sherwood Insurance Agency had the blank policy in its possession, countersigned by the officers of the Company. We wrote this policy by application. The Company had an application on this policy. The policy was issued. I can not say whether I wrote it or the girl in the office wrote it, but the Sherwood Agency issued it. * * *

"I was trying to keep $17,000.00 on this gin. I got this figure of $17,000.00 from the values of the gin. Mr. Jackson told me that he wanted that much insurance. One of the applications said $17,000.00 total insurance schedule. All the Companies required an application in connection with the policies on the gin. They required these applications on gin risks only, but all Companies require an application on gin risks. I could not say whether Mr. Jackson signed the application that was made to the Retailers Fire Insurance Company in 1925 for this $3,000.00 policy, we might have signed one for him. He signed the original application and then gave us the power to make applications to various other Companies. Mr. Jackson left the looking after all this insurance to the agency. Pursuant to his leaving it to us, either I or Mr. Jackson signed an application for this $3,000.00 policy in 1925, and if I signed it, I signed Jackson's name to it. This policy was subsequently cut $500.00 to $2500.00, and the policy as reduced to $2,500.00 had run out before the fire. This various switching of policies, that is, when one would be cancelled and another put on the risk, I would either sign Jackson's name to the application to the new Company or he would sign it, so that the business was handled as to all Companies the same way. One Company would tell me to cancel and I would cancel and send a new application out to another Company to see whether the new Company would take the risk. When I signed an application to the Retailers Fire Insurance Company with Mr. Jackson's name or Mr. Jackson signed it himself, the application says that the insured wants so much insurance on the gin and this application has got a lot of information on it. There are about 100 questions on both sides of a sheet of paper. These questions are to be answered by him. When these questions are all filled out and the same signed, it requests the Company to issue Mr. Jackson so much insurance on this gin, that is what the application is for. It tells how much insurance he wants on his building and how much he wants on his machinery and how much he wants on his cotton house and

how much he wants on his seed house and how much he wants on the platform and scales and tower, if he has any. That all appears on the application. When the application is entirely completed, it is sent to the Company. Most· of the time the Companies turn them back to you. They write and decline the application. When they write and say we don't want this, we don't write cotton gin, that is the end of it. Most always they do that. * * * The Retailers Fire Insurance Company in 1925 originally had a $3,000.00·policy that was cut to $2,-500.00. About three months after that policy was issued, they reduced it $500.00. We wrote this policy with the permission of J. N. Parsons & Company of Dallas. Parsons wrote me a letter to write it. He was the General Agent for the Company in Texas at that time. Pursuant to his letter, I did write the policy. That was also the way the matter was handled with all the other Companies that I have mentioned as having had a policy in force on the gin. I had a letter from the Retailers Fire Insurance Company before this 1925 policy expired, and they refused to re-write it and told me to mark my records accordingly. This $2500.00 policy expired on October 20th, 1926. Before that day the Retailers Fire Insurance Company wrote me a letter and told me they were not going to write any further policy on that risk, that they did not want it. This was in line with what the other Companies had been doing; the risk was a hard risk on account of the character of the risk, not on account of Mr. Jackson. * * * Mr. Jackson and I talked every day or two in my office. He would come in and give me insurance on other property all the time. Mr. Jackson told me to keep the gin insured and I tried to do so. I did the best I could. It meant money to me to insure it. At the time the fire happened, I had applications out to Companies for insurance on this gin. I had out applications for $8,000.00 worth of insurance. These applications had gone to a brokerage company in New York. I could not place the risk in Texas. This brokerage concern in New York was Arthur F. Houghts & Company and the application to them was for $8,000.00. The policies then outstanding in the Fire Association and the Old Colony totaled $9,000.00, which with the $8,000.00 application that was pending in New York was to make up the total of $17,000.00 of insurance. That was the shape the matter was in when the fire happened. As to how Mr. Jackson went about paying for these policies, we would bill him on the month following the date of the policy and he would pay us when we would see him. Mr. Jackson has not offered to pay me, nor has he tried to pay me, nor have I asked him to pay me any premiums for the Retailers Fire Insurance on any policy, or conversation or anything else having to do with the fire risk following October 20th, 1926. Nothing like this has been done. * * *

"On the Monday before the fire happened I had applications out for insurance for the Jackson Gin Company; one of them was to the Westchester Fire Insurance Company, one to the Liverpool, London & Globe and one to the National Fire Insurance Company of Hartford. I mentioned a letter that I received from the Retailers Fire Insurance Company before their policy expired· in 1926, that they did not want the line any more. From the time I got that letter from the Retailers Fire Insurance Com-

pany until the fire I tried every old line company in the State of Texas to get that gin covered by insurance. I could not place it in à single company. I was making this effort continuously. During 1926 Mr. Jackson paid the premiums on a policy in the Old Colony Insurance Company for $5,000.00 of $197.50 and policy in the Fire Association of Philadelphia for $4,000.00 of $158.00 and a policy on the products for $2,000.00, on which the premium was $39.50. That is all the premiums he paid. As to printed form of the fire policy in use, the Company has the right to cancel at any time. All Companies use the same form of policy and have used them since I have been in the insurance business. * * * This expired ·policy in the Retailers Fire Insurance Company is the first and only cotton gin policy we have had in our office. It was authorized by Mr. Parsons and he lost his job over that policy. At the time Mr. Jackson talked with me in Shamrock when I was standing by the bank and he was going to Bowie to see his partner, I had applications pending for the full line of insurance which the Special Agents thought they could write for me, and I thought the insurance would be in. It did not make any difference as it would be binding anyhow. Those applications were pending with the National Fire Insurance Company and the Westchester Fire Insurance Company. I had letters and telegrams declining them before the fire. I made applications for this insurance every day. I keep no record of them; I just made out the application in triplicate form and mailed· the application and all in.

" * * * Mr. Jackson was to pay the premiums upon presentation as to all insurance I carried for him. Mr. Jackson pays us all he owes us, that was the understanding between us, that we would send in the bill and it would be paid and it was paid in each instance. I don't recall that I ever told Mr. Jackson that his Retailers policy for $3,000.00 had been reduced to $2,500.00. I don't recall that I told him that I had received a letter from the Retailers Fire Insurance Company, instructing us not to re-write its policy. I don't tell that because I get that in every mail every day. I did not tell him that the Retailers Fire Insurance Company had refused to issue a policy, they quit writing business. I never told him that he had only $9,000.00 insurance on his gin, I had $17,000.00 pending. I did not tell him he· had $17,000.00 in force on the gin. He had paid me for $9,000.00 worth. I did not collect for the policies until I get them approved and the policy issued and know the policy is going to stand before I collect for it. As to the form of the bill, I generally put on there so much insurance, I don't put the rate nor the name of the Company or anything about it. If there was more than one Company, I would not tell him how much. was going to one Company, nor how much to an- other, just the total amount of the insurance. If it was Mr. Jackson's personal business, we would put the house insured on the bill; if it was a farm dwelling, we would say what number the farm was or which farm it was and the section it was on.

" * * * All of the policies were written in the same way on the state form. After I got the letter from the Retailers Fire Insurance Company in October, 1926, I never re-applied to them for insurance on the gin. I had the letter from them that they refused to write it."

Jackson, the president of the gin company, testified with reference to this matter, as follows:

"I am J. H. Jackson, the president of the Jackson Gin Company, which is a corporation. I am manager of the Gin Company. * * * The Sherwood Agency at Shamrock carried my insurance. My first dealing with Mr. Sherwood was some five or six years ago when I built a gin at Shamrock. When Mr. Sherwood got so he was unable to attend to business I dealt exclusively with Mr. Wooten. My insurance policies were kept in the Sherwood Agency office. They asked me to leave those policies there, said if I would leave them there they could see that they were renewed and properly taken care of. Mr. Wooten made this request of me. * * * I think the fire insurance was dated about August 1st, in 23 or 24, and then in October following it was cancelled. They notified me by telegram that it was cancelled, and I went to Mr. Sherwood and they replaced it, if it was cancelled after that I never knew of it. As to any conversations I had with Mr. Wooten about the total amount of insurance he was to carry for me on this property, I think he told me at the start that he had $18,500.00 on the gin, that was the first year, then he came to me and told me they were cutting it down to $1700.00, something like that; as to the policies themselves, I never saw one of the policies in my life. I think Wooten has 15 of my houses insured and I have never seen a policy. I never saw a policy on this gin until after the fire. Wooten told me that he had $17,000.00 insurance. In response to your question as to whether in the month of September, 1926, I had any conversation with Mr. Wooten about my insurance on this gin, well, I would go to them nearly every year just before we would start ginning and speak to them about the insurance, because it was like Mr. Wooten said, it was hard to place. I knew that. We generally started ginning in September, about the middle of September. We were talking about it and I asked him about it and he said you need not worry, I will place it back in the same Companies and take care of it for you and I said be sure you do it. He told me then what Companies he had it in and told me he would place it back in the same ones it was in. It was Liverpool London & Globe, Retailers and Old Colony, He never notified me at any time that any Company had declined to take it until after the fire. * * * Mr. Wooten never told me that this policy had been cut to $2500.00. In September, 1926, he told me that I had a $3,000.00 policy in the Retailers Fire Insurance Company, that he would renew the insurance in the same Companies for $17,000. He did not tell me anything about having to get somebody's consent to do that, he had full authority to sign my name to all of these contracts, and he had agreed to take care of me for all of it. * * * I did not learn from any source until after the fire that the Retailers Fire Insurance Company had declined to re-issue their policy. In my conversation with Wooten before this policy expired, nothing was said about the premiums, because if I wanted insurance on cotton or seed or anything I would call Ben up over the telephone and tell him to place me $6,000 or whatever I wanted and I kept compensation insurance with him too, and whenever my insurance was due, if it was for Groom I would tell him to take or mail the

bill to Walter Bledsoe, my son-in-law and bookkeeper and he would mail him a check. When the bill for premiums would be presented, they would say, due Sherwood Agency so much money. As to when Wooten told me that he did not have this property covered for $3,000.00 in the Retailers Fire Insurance Company, the fire happened on Sunday night about dark. I suppose the gin was struck by lightning. The next morning some fellow 'phoned me about the fire, I asked him could I do any good, and he said no. That next morning I went to the office and Wooten was gone so I went to Groom and got back about the middle of the evening and he still was not there and I walked into the office and Mr. Jimmy Rollins handed me two policies and says, 'Jack, here are two of your policies, I can not find any more.' And I replied, 'I have got to go to Bowie to see my partners to see if they want to order machinery to put up this gin again.' As we drove up the street the bus had to go by the hotel and I saw Ben Wooten standing on the corner by the bank, so I told the bus driver to slow down and got out and told Ben Wooten about the fire, and he said that he knew about it and I said 'Jimmy said he could not find but two of them policies,' and Ben said, 'The others are there, I will have them for you when you come back.' I saw him again a day or two later and he said that was all he had. I asked him about the others and he said, 'I have been trying to write it,' and I said, 'Why didn't you tell me, you told me all the time you had the full $17,000.00. Why didn't you tell me you couldn't place it?' and he said, 'I was trying to place it.'"

"Ever since I have been in Shamrock those men in the Sherwood Agency either did look after my insurance or were supposed to look after it. I left my policies with them and the handling of the applications and the entire business with them after I turned the insurance line over to them. I don't recall that I ever read any of my policies, though I might have seen them. I think the first insurance on the gin was taken out for $18,500.00, then they told me they cancelled that in October, the Company wired me it was cancelled. They wired my bookkeeper at Groom and he called me over the telephone, and I went right to Mr. Sherwood and he said, 'I have done placed it in other Companies' and I asked him what Companies it was in, whether they were old line Companies. I told him I didn't want it in a Mutual of any kind. The question of $17,000.00 on the gin came up about the second year. Nearly every fall before the ginning season started I would talk with Mr. Wooten about compensation insurance, that was the hardest for us to keep straightened and would talk to him about the ginning insurance. I never asked to look at any of the policies, but I would ask how it was and if he was renewing it, or if he could renew it. I expect nearly every fall I would ask him how much he had and whether it was cut down. I told him to put all he could on it because you could not get but one-half of what it was worth. * * * The balance of the cancellations were handled in his office. He never notified me. I guess he sent in my applications with my name signed to them. I mentioned the conversation I had with him on Monday before the fire and Mr. Kennedy asked him about the $17,000.00 insurance on the gin that day. Wooten stated that he had $17,000.00 of insurance on the gin.

He got out his books and looked over them standing right there by his desk. That was on Monday before the fire. Having left the matter there in his office with him, I never had any occasion to talk with him about the fact that the Retailers Fire Insurance Company had prohibited him from writing a policy on all gins, or if he mentioned to me that they had told him they would not carry the line any further.

"* * * He never told me they had cancelled it or reduced it until after the fire. He did not tell me in September, 1926, about having to send an application to Dallas or anywhere else. The first time I knew about sending an application to get it was here today, I thought they wrote the policy and send it in and if the Company did not accept it they cancelled it. I did not talk with him about signing any such application as that to be sent off to the Company anywhere."

"I don't remember ever signing an application myself about this gin insurance. I don't think I ever did. I did not sign any recently. I did not know they had to be signed."

█ The appellant has challenged the findings of the jury upon the ground that they are not supported by the evidence, to the effect that Jackson had an agreement with Wooten to renew the $3,000 policy in the appellant company, and that Wooten had apparent authority as agent for the defendant company to make such an agreement. We think these contentions are correct. The effect of the evidence above set out is to show that the gin company appointed Wooten its agent to procure insurance and to keep the same in force. Wooten did not buy an interest in the Sherwood Agency until January 1, 1927. Prior to that time he was an employé of the agency. The insurance company had notified the Sherwood Agency prior to the expiration of the first policy that it did not care to renew it, and advised Mr. Wooten to make such notation upon his records. The president of the gin company had given Wooten general authority to keep the gin insured, the only limitation being that the insurance must be written in old-line companies rather than mutual companies.

Jackson testified that he did not know that applications for insurance on gins had to be signed. Wooten filled out and signed the applications for the gin company, sent them in to such insurance companies as he thought would take the risk, and, when an application was refused, Wooten would send other applications to other companies until he succeeded in placing the risk. At the time of the fire, he had applications for $8,000 insurance pending with New York insurance brokers because he had not been able to place the risk with any companies he could find in Texas.

██ Under all the circumstances disclosed by the testimony, he was the agent of the gin company, and notice to him by the appellant that it would no longer carry the risk is, un-der the general law of principal and agent, notice to the gin company. Neither Wooten nor the Sherwood Agency were made parties to the suit. The gin company must be held to know that it had not paid any premiums to the appellant company for a renewal of the policy.

In Hartford Fire Insurance Co. v. Walker, 94 Tex. 473, 61 S. W. 711, the Supreme Court held that a person taking an application for insurance and sending it to an insurance company for acceptance or rejection was the agent of the insured and not of the company, and that he could not bind the company. There is no material conflict in the testimony upon any issue and especially with reference to this matter. Since Wooten was the agent of Jackson or at most the agent for both parties, the jury's findings are not supported by a preponderance of the evidence. Camden Fire Insurance Co. v. Hill (Tex. Com. App.) 276 S. W. 887; Overland Sales Co. v. American Indemnity Co. (Tex. Civ. App.) 256 S. W. 980; Liverpool & London & Globe Insurance Co. v. Cabler (Tex. Civ. App.) 271 S. W. 441; Westchester Fire Ins. Co. v. Robinson (Tex. Civ. App.) 192 S. W. 793; National Fire Ins. Co. v. Oliver (Tex. Civ. App.) 204 S. W. 367; Aetna Ins. Co. v. Richey (Tex. Civ. App.) 206 S. W. 383; Great American Ins. Co. v. D. W. Ray & Son (Tex. Civ. App.) 4 S.W.(2d) 88.

█ The appellant prays that if the judgment is reversed it be rendered by this court. This court is without authority to render a judgment for the appellant when it has been reversed because of the insufficiency of the evidence to support the verdict of the jury. We are not authorized to set aside the jury's findings and substitute the findings of this court. Taylor v. U. S. Fidelity & Guaranty Co. (Tex. Com. App.) 283 S. W. 161; Schumann v. Brownwood Mutual Life Ins. Co. (Tex. Com. App.) 286 S. W. 200; Sprinkles v. Kerbow (Tex. Com. App.) 279 S. W. 805; Turley v. Campbell (Tex. Com. App.) 241 S. W. 682; Gibbs v. Barkley (Tex. Com. App.) 242 S. W. 462; Brown v. City Service Co. (Tex. Com. App.) 245 S. W. 656.

For the reasons stated, the judgment is reversed, and the cause is remanded.