Idris TRAYLOR, Individually and d/b/a
Idris Traylor Cotton Company,
Appellant,

v.

Oscar B. GRAY et al., Appellees.

No. 1076.

Court of Civil Appeals of Texas,
Corpus Christi.

Jan. 6, 1977.

Rehearing Denied Feb. 17, 1977.

646

## OPINION

YOUNG, Justice.

The Grays, a farming partnership, sued defendants Traylor and Palmetal for losses sustained upon their discovery that an advance contract to sell their 1974 cotton crop had not been accepted by the purchaser (Traylor) as represented to them by Dan Davis, manager of Palmetal Gin Company. Plaintiffs-appellees (Grays) consist of Oscar B. (Buster) Gray, Sterling S. Gray, and Jimmy A. Gray, individually and d/b/a Oscar B. Gray & Sons. Defendant-appellant Traylor is Idris Traylor, individually and d/b/a Idris Traylor Cotton Company. Defendant-appellee Palmetal includes Major Davis, Dan A. Davis, G. Wayne Davis, and Jean E. Kirkland, Jr., individually and d/b/a Palmetal Gin Company. From a jury verdict for the Grays, Traylor has appealed. Palmetal has not appealed.

The factual setting of this case requires an understanding of the cotton marketing customs in the Rio Grande Valley, and of the long-term relationship between the Grays and Dan Davis, and also between Davis and Traylor. For example, for many years a cotton farmer in the Rio Grande Valley marketed his cotton by delivering the harvested crops to a gin for processing and then selling to buyers after exhibiting samples from the ginned bales. As one of several services to customers, ginners often displayed the processed samples for the farmers and dealt directly with the buyer or broker in effecting the sale. The buyer paid the ginner, who deducted the cost of ginning and any other costs, such as seed or fertilizer previously advanced by the ginner to the farmer, and paid the remaining proceeds to the farmer. Ginners performed these various services for farmers in order to retain the farmers as gin customers.

For 10 to 12 years the Grays ginned their cotton at Palmetal Gin. Dan Davis offered the processed cotton samples to buyers, made the sales to Traylor (the only buyer with whom he dealt), received the purchase price from Traylor, and disbursed the net proceeds to the Grays.

Jack Skaggs, Stiernberg, Skaggs & Koppel, Harlingen, for appellant.

Gordon L. Briscoe, McCullough, Murray & McCullough, Bonner & Bonner, Merrill W. Russell, Greenwood & Russell, Harlingen, for appellees.

In 1972, a system of advance contracting was begun in which the future crop was purchased in the fall or early winter before it was planted. At harvest time the farmer received his advance contract price for the cotton regardless of the harvest time market price. Ginners performed similar services for farmers under the new system. Instead of effecting a sale by displaying samples of processed cotton, however, the ginners negotiated an offering price from the farmer and purchase price from the buyer.

The price quoted by the buyer was considered firm for only the day on which the agreement was made. This was due to the daily fluctuation in cotton futures and the practice of buyers reselling their contract rights to mills or other ultimate users on the same day the deal with the farmers was made. All these negotiations were often conducted by telephone. The ginner would then secure a form contract from the buyer (or use a form already in his possession), present it to the farmer for signature, and send it to the buyer for signature.

In 1972 and 1973, Dan Davis of Palmetal Gin Company completed the negotiations with Traylor, used a Traylor "Confirmation of Purchase" form from a supply kept at the Palmetal office, and took the form to the Grays for signature. After he and a member of the Gray partnership signed the form, Davis detached one of the carbon copies and left it with the Grays. By contrast other ginners would send all copies to the buyers and wait until a fully signed copy was returned by the buyer before giving a copy to the farmer.

Without questioning the whereabouts of the missing copy, Traylor duplicated an additional copy to replace the missing one, signed two copies to be returned to Palmetal for the gin and the farmer, and kept the third completed copy for his own file. Instead of giving the Grays their fully signed copy, Davis kept both the gin's copy and the Grays' copy in the gin safe. The Grays never saw a confirmation form with Traylor's signature, although Davis told them he kept the signed copy at the gin.

As it appeared to the Grays, therefore, the sale was complete upon oral agreement between Davis and Traylor, and the contract formalities to reflect this oral agreement were completed when the confirmation form was signed by themselves and Davis. In fact, the contract was complete when the oral agreement was made, but without a subsequent writing, the statute of frauds would prevent its enforcement. Tex.Bus.Com.Code 2.201. However, Traylor's practice of reselling its contract rights to mills immediately after the oral agreement and before the writing was signed shows the reasonableness of the Grays' belief that a firm commitment had been made orally.

Idris Traylor or Buster Atkins, a member of the Traylor firm, actually agreed to the purchase price for the 1972 and 1973 crops, signed the confirmation forms, and sent the signed forms to Davis. In 1974, however, Traylor never agreed to the price shown on the confirmation form, nor did it sign or even receive the confirmation form signed by the Grays and Davis. It is the 1974 advance contract which gave rise to this lawsuit.

In early January of 1974, the price of cotton had been rising and had reached 75¢ per pound. Eva Gray, wife of Oscar B. Gray, testified she received a purchase offer of 76¢ per pound from Ross Bigham of the Elrod Gin with whom the Grays had ginned prior to their use of Palmetal Gin. Mrs. Gray called Davis to see if he could meet that price. Davis testified that the request was for 75¢ rather than 76¢, that he received a firm acceptance from Traylor for 75¢, and that he prepared a confirmation form accordingly. In the meantime, Bigham suggested the Grays should offer their cotton for 78¢ per pound. Upon learning the Grays now sought 78¢, Davis disposed of the 75¢ confirmation form, told the Grays he would call Lubbock, and then called the Traylor home office in Lubbock to inquire about a 78¢ deal. Traylor agreed to work on it, but indicated there was little or no hope the higher price would be accepted. Davis said he was told the 75¢

price was probably still good, but no commitment was made by Traylor.

In danger of losing the Grays' ginning business which comprised a substantial proportion of Palmetal's business, Davis devised a plan to retain their business by absorbing some of the price himself. He and his partner Jean Kirkland agreed to absorb up to 3¢ per pound if necessary. Davis called Mrs. Gray and told her "We are going to take the cotton." He also informed Mrs. Gray that 3¢ of the 78¢ price might have to be absorbed by Palmetal if cotton was bringing less than 78¢ at harvest time. Following this conversation, Mrs. Gray called Bigham at Elrod Gin to break off their negotiations, reporting to him that their cotton had been sold.

The testimony is disputed as to the time when various information was transmitted by telephone between Davis and Traylor's office in Lubbock. Although disputed by Davis, there was testimony that Davis asked if he could use a Traylor form or use the Traylor name, to which Atkins replied emphatically that the Traylor form could not be used unless a price commitment had been made by Traylor. In a subsequent call to Kirkland, Fred Traylor restated the instruction not to use the form without Traylor's authorization. Nevertheless, Davis prepared a Traylor confirmation of purchase form listing the contract price as 78¢ per pound. Davis took the form to the Grays' home, and again led the Grays to believe their cotton was sold. Mr. Gray signed the form, Davis signed for Palmetal, tore off one carbon copy which he left with the Grays exactly as was done in prior years, and said he would keep a copy signed by Traylor at the gin.

At that point, the Grays had completed all steps in advance contracting their 1974 cotton crop just as in 1972 and 1973. Unknown to them, neither Traylor nor anyone else had agreed to purchase their 1974 crop at 78¢ per pound or any other price. Davis knew that Traylor, the only buyer with whom he negotiated, had not agreed to purchase the Grays' cotton. He knew it was fruitless to mail the 78¢ confirmation form to Traylor since no agreement had been reached with Traylor. He merely kept it at the gin. Davis also knew that Traylor would not sign a 78¢ form even if Traylor were willing to pay 75¢ and Palmetal supply the additional 3¢ per pound. Davis was aware that Traylor sold the contract forms as commercial paper and could not sell a contract that did not reflect the true obligations of the parties.

Although the information transmitted by Davis was disputed, the jury found in special issue 7 that Buster Atkins of the Traylor firm learned in a telephone conversation with Davis on the day it was signed that a 78¢ confirmation form had been signed. Not until harvest time in July of 1974, did the Grays learn that Traylor had not purchased their cotton. In the meantime, the market price of cotton had dropped dramatically, and in fact had reached and passed its peak at the time Davis was requesting a price commitment from Traylor.

The Grays instituted this suit alleging breach of oral contract and fraud by Traylor and Palmetal. Damages were sought against Palmetal for 3¢ per pound on a production of 321,792 pounds of cotton, and against Traylor and Palmetal jointly and severally for the difference in the harvest time market price and 75¢ per pound. The jury's answers to special issues 12–15 regarding the breach of contract claim were disregarded upon motion by the Grays, and the contract cause of action is therefore not before us. Judgment for the Grays was based exclusively on the fraud cause of action.

Appellant Traylor brings 35 points of error. Points 25–27 urge error based on violation of the statute of frauds, lack of formation of a contract, and failure to tender the cotton to Traylor according to the terms of the contract. But the contract cause of action was abandoned by the Grays and recovery was based entirely on the tort action of fraud. Therefore, none of these points of error is relevant to the judgment or this appeal. Points 25–27 are overruled.

▮ The theory which the Grays must sustain in order to recover from Traylor

demands proof of the essential elements of actionable fraud, which are: 1) a false statement of material fact; 2) made to be acted on; 3) actually believed; and 4) acted on with the consequential injury to the person acting thereon. *Custom Leasing , Inc. v. Texas Bank and Trust Company of Dallas,* 516 S.W.2d 138, 143 (Tex.Sup.1974); *Kain v. Neuhaus,* 515 S.W.2d 45, 50 (Tex. Civ.App.—Corpus Christi 1974, no writ); *Menking v. Bishman Manufacturing Company,* 496 S.W.2d 762, 765–66 (Tex.Civ.App. —Corpus Christi 1973, no writ); *Long v. Smith,* 466 S.W.2d 32, 36 (Tex.Civ.App.— Corpus Christi 1971, writ ref'd n.r.e.).

Since the Grays had no direct contact with Traylor, the Grays cannot hold Traylor liable for the conduct of Davis unless Davis' actions can somehow be imputed to Traylor and unless Traylor's defenses are neutralized through some action of its own.

We must first determine if a false statement of material fact was made. In point 8, Traylor urges us to find the jury's answer to special issue 1 conclusive against such a finding. We do not agree. Issue 1 inquired whether Davis *stated* to the Grays at the time of signing the confirmation of purchase form that Traylor had purchased their cotton. The jury answered in the negative. However, in special issues 6, 10 and 11, the jury found that the Grays believed Davis had authority to purchase for Traylor, that he had apparent authority, and that they relied on Davis' apparent authority.

We believe the collection of representations made by Davis is equivalent to a stated assertion that Traylor had purchased the cotton. Stating "Traylor has purchased your cotton" would have added little to the meaning conveyed to the Grays by the statements of Davis. These representations were: 1) that Davis would call Lubbock (Davis' standard method of referring to Traylor's main office); 2) that "we are going to take your cotton"; 3) that "the cotton is sold"; and 4) use of a Traylor confirmation form. Coupled with their long experience with Davis and past sales exclusively to Traylor through the same procedures and contract form, these statements plus use of the form were equivalent to an outright statement by Davis that Traylor had agreed to purchase their 1974 crop, where in fact, Traylor had not agreed to the purchase. The statement was false and was material.

There can be no question that the false representations were made to be acted upon. Davis brought the form to the Grays' home with the intent to secure the signature of a member of the Gray partnership. He pursued the negotiations with Traylor and even agreed for Palmetal to absorb part of the purchase price in order to save the Grays' ginning business for Palmetal. As long as the Grays believed their crop was sold to Traylor through Davis, they would be expected to end discussions with Ross Bigham at Elrod Gin. The testimony shows that the Grays acted upon the belief that Traylor purchased their crop and promptly broke off discussions with Bigham. In reliance on this belief, the Grays made no other effort to sell their crop, although the market took a rapid downward turn. We conclude that the past business dealings among all parties in addition to Davis' representations in January 1974 permitted the Grays to reasonably rely on Davis and to change their position based on his representations to them. Traylor's points of error 9 and 10 in which he asserts there was no evidence or insufficient evidence for the Grays to believe Traylor authorized Davis to purchase their cotton for Traylor are overruled.

The next question is whether Davis' misrepresentations can be attributed to Traylor. Appellant argues in points 1, 6 and 15 that Davis' relationship with the Grays precludes any form of agency between Davis and Traylor. We do not agree. In special issue 25, the jury found that Davis acted as agent for the Grays in selling their 1974 crop, whereas in issue 10, the jury found that Davis had apparent authority to purchase the Grays' cotton for Traylor. Appellant says these answers are in irreconcilable conflict and urges that all facts known by Davis must be imputed to

the Grays as a matter of law due to the principal-agent relationship between them. Although a principal may not generally recover from another on the basis of a misrepresentation made to him by his own agent, *Kunkel v. Poe Land & Development Company*, 393 S.W.2d 191, 196 (Tex.Civ. App.—Corpus Christi 1965, no writ), there are situations where the principal is not bound by the acts or knowledge of his agent.

■ A principal may not be bound where the agent performs unauthorized acts in conflict with the interests of his principal and in pursuit of the interests of another. See *Camden Fire Ins. Co. v. Hill*, 276 S.W. 887 (Tex.Comm'n Appeals 1925, judgment adopted); *Board of Trustees, Tarrant County Junior College v. National Indemnity Company*, 484 S.W.2d 399, 403 (Tex.Civ.App.—Fort Worth 1972, writ ref'd n.r.e.); *Retailers Fire Ins. Co. v. Jackson Gin Co.*, 10 S.W.2d 799 (Tex.Civ.App.— Amarillo 1928, writ dism'd); and *Aetna Ins. Co. v. Richey*, 206 S.W. 383 (Tex.Civ.App.— San Antonio 1918, no writ). Certainly, Davis' false representations were in conflict with the interest of the Grays and in pursuit of his own interest. We cannot say, however, that they were undertaken for the benefit of Traylor. Upon this state of the facts, neither the Grays nor Traylor is chargeable with knowledge of Davis' unauthorized acts.

Although Davis did not mislead the Grays in pursuit of Traylor's interests, he had performed a number of services for Traylor over the years. There is evidence to show that Traylor permitted Davis to initiate contacts with farmers to invite them to make an offer to sell their cotton to Traylor; permitted Davis to keep a supply of Traylor's confirmation of purchase forms at the gin office; and permitted Davis to send confirmation forms to the main office with the last carbon removed without inquiring what happened to the missing copy.

Traylor returned two fully signed copies of the form to Davis rather than sending one to Davis and one to the farmer. Although contracts were between Traylor and

the farmers, Traylor remitted the purchase price to Davis, who, in turn, forwarded the net proceeds to the farmers.

All of these acts show a working relationship between Davis and Traylor which could be interpreted by farmers as authorization for Davis to carry out various aspects of cotton purchases on behalf of Traylor. Evidence which lends added weight to this interpretation of these ambiguous acts was the testimony of Bill Gray (brother of Oscar Gray) and Dan Davis who related an incident in 1973 when Bill Gray had ginned a small part of his crop at a gin other than Palmetal. Despite the listing of several gins as authorized processors on the Traylor confirmation form, Davis and Atkins insisted that cotton must be ginned at Palmetal to apply on the Traylor contract. Eventually Atkins succeeded in including this cotton on the contract, and required the processed bales ginned at Producers Gin to be delivered to Palmetal for delivery to Traylor along with the main part of the crop ginned at Palmetal. Payment for all the cotton was made to Palmetal. Surely if Traylor dealt with Davis exclusively as an agent for farmers and as merely the source from whom offers to sell were frequently received, it would have had no particular concern over which gin processed the farmers' cotton and would have accepted cotton processed at Producers Gin without hesitation. Traylor's concern over Palmetal receiving the ginning business surpasses an interest in merely acquiring baled cotton from the farmer.

■ Apparent authority is based on estoppel, and it must arise from words or conduct of the principal. *Custom Leasing, Inc. v. Texas Bank and Trust Company of Dallas*, 516 S.W.2d 138, 144 (Tex.Sup.1974); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778 (Tex.Sup.1974). These acts, taken together, clothed Davis with indicia of authority sufficient to communicate to farmers that Palmetal and Traylor had a close working relationship such that Davis could act on behalf of Traylor, and that Traylor could require use of Palmetal Gin before accepting the processed cotton. Although

the jury found in special issue 10 that Davis had apparent authority to act on behalf of Traylor, we need not decide if these acts alone are sufficient to bind Traylor as apparent principal. The ability of Traylor to dispute Davis' agency or apparent authority depends on the application of estoppel. The Grays assert Traylor is liable due to the negligent failure of Buster Atkins to correct the Grays' misimpression when he learned the Grays believed Traylor had agreed to purchase their cotton. Estoppel, however, is not an independent cause of action, but an equitable defense to preserve rights, and not to bring a cause of action into being. *Southland Life Ins. Co. v. Vela*, 147 Tex. 478, 217 S.W.2d 660, 663 (1949); *Clifton v. Ogle*, 526 S.W.2d 596, 602 (Tex. Civ.App.—Fort Worth 1975, writ ref'd n.r. e.); *Dobbs v. Camco, Incorporated*, 445 S.W.2d 565, 571 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.). Liability cannot be based on estoppel alone. The effect of estoppel is to prevent a party from asserting a legal right to which he would otherwise have been entitled.

▆ The elements of estoppel are: a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied or acted on it to his prejudice. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 932 (1952); *Emmord's, Inc. v. Obermiller*, 526 S.W.2d 562, 568 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.).

▆ Estoppel can arise by silence as effectively as by words where there is a duty to speak. *Employers Casualty Company v. Tilley*, 496 S.W.2d 552, 560 (Tex.Sup. 1973); *Cooper Petroleum Company v. La-Gloria Oil and Gas Company*, 436 S.W.2d 889 (Tex.Sup.1969); *A. R. Clark Investment Company v. Green*, 375 S.W.2d 425 (Tex. Sup.1964); *Johnson v. Sovereign Camp, W.O.W.*, 125 Tex. 329, 83 S.W.2d 605 (1935);

*Burnett v. Atteberry*, 105 Tex. 119, 145 S.W. 582, 587 (1912). Estoppel by silence is based on the principle that, if a person is silent when in conscience he should speak, equity will close his mouth when in conscience he ought to remain silent. *Silverman v. Harmon*, 250 S.W. 206 (Tex.Civ.App. —San Antonio 1923, writ dism'd). See also 31 C.J.S. Estoppel § 87 and Prosser, Law of Torts, § 105 (4th Ed. 1971). Where estoppel is based on silence or inaction, there must be some element of turpitude or negligence connected with the silence or inaction by which the other party is misled to his injury. *Humble Oil & Refining Co. v. Trapp*, 194 S.W.2d 781, 786 (Tex.Civ.App.—Austin 1946, writ ref'd).

▆ The first two elements of estoppel are met if Atkins, a member of the Traylor firm, concealed the truth by failing to warn the Grays that no contract had come into existence after Atkins learned of the Grays' erroneous belief. It is undisputed that neither Atkins nor anyone at Traylor informed the Grays that Traylor had not purchased their cotton. The jury found in special issue 7 that Atkins learned of the Grays belief on the day the confirmation was signed. Appellant complains there is no evidence or insufficient evidence to sustain the jury finding.

Although Atkins denied receiving a call from Davis indicating the form had been signed, Davis testified that he talked to Atkins or possibly Fred Traylor on the day the Grays signed the confirmation. In this call, Davis testified he stated that the Grays had signed a contract for 78¢ per pound and thought their cotton was sold. Although disputed by Davis, the testimony of Atkins and Fred Traylor shows that Davis had inquired a few days before about use of the Traylor name or Traylor form even without a purchase price agreement from Traylor. Any information reaching the Traylor firm indicating a contract for 78¢ (a price 3¢ per pound higher than Traylor had ever paid) had been signed by the Grays should have altered Traylor to inquire into the possible unauthorized use of its confirmation form. We cannot say the jury's answer to special

issue 7 was without sufficient support in the evidence. Appellant's points of error 11 and 12 are overruled.

The third element of estoppel requires a party asserting estoppel to be without knowledge or the means of knowledge of the true facts. *Barfield v. Howard M. Smith Company of Amarillo*, 426 S.W.2d 834, 838 (Tex.Sup.1968); *Gulbenkian v. Penn*, supra; *Richey v. Miller*, 142 Tex. 274, 177 S.W.2d 255, 257–58 (1944). There can be no estoppel when the party claiming the estoppel conducts himself with careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss. *Barfield v. Howard M. Smith Company of Amarillo*, supra at page 839. A party is ordinarily under a duty to exercise reasonable care and diligence in relying on statements of an adverse party as a basis for estoppel. The defrauded party, however, is under no duty to make an investigation to discover the existence of fraud, unless and until he has acquired some knowledge of facts that would put a reasonable prudent person on inquiry. *Long v. Smith*, supra. Where the parties have equal access to information, such as a written contract, there is no concealment. See *Barfield v. Howard M. Smith Company of Amarillo*, supra, and *Champlin Oil & Refining Co. v. Chastain*, supra. But where knowledge is unequal, reliance on the representations is reasonable, and failure to make further inquiries is not negligent, estoppel is not defeated by failure to discover the truth. Of course, any party without knowledge could almost invariably ascertain the truth with sufficient diligent inquiry, but the law does not require such inquiry where there is no reason to be suspicious and there is no negligence. See *Cooper Petroleum Company v. LaGloria Oil and Gas Company*, supra, in which a simple telephone call would have led to ascertainment of the truth, but LaGloria reasonably relied on the representations which made no such inquiry appear necessary. A telephone call from the misled party would have sufficed, but the question was to determine which party had the duty to make the call. The court in *Cooper Petroleum* placed the duty on the party possessing the knowledge. Similarly, the method by which Davis dealt with the Grays in 1974 was no different from that of prior years, and therefore, there was nothing to trigger any suspicion or apparent need to verify the truth of Davis' representations or to investigate the lack of communication from Traylor. We conclude that the duty to make the telephone call or other contact rested on Traylor.

In the context of estoppel by silence, the fourth element (intention that the concealment be acted upon) is met by turpitude or negligence on the part of the party to be estopped. *Cooper Petroleum v. LaGloria Oil and Gas Company*, 436 S.W.2d 889, (Tex.Sup.1969); *Champlin Oil & Refining Company v. Chastain*, 403 S.W.2d 376 (Tex.Sup.1965); *Humble Oil & Refining Co. v. Trapp*, supra. In special issue 8, the jury found Atkins was negligent in his failure to notify the Grays. In points of error 13 and 14, Traylor contends there is no evidence or insufficient evidence to sustain this finding.

Both Atkins and Idris Traylor testified that they would have made contact with the Grays had they known that the Traylor form had been used and that the Grays were relying upon the sale. Thus, they testified to the standard of care of a reasonable person possessing such knowledge. The jury found Atkins possessed the requisite knowledge and it is undisputed that Traylor did not contact the Grays. It is, therefore, reasonable for the jury and for us to conclude that Traylor fell below its own standard of care, and that such failure was negligence. Points 13 and 14 are overruled.

The final element of estoppel requires detrimental reliance on the concealed fact or a change of position. These elements are discussed at length in *Petroleum Anchor Equipment, Inc. v. Tyra*, 419 S.W.2d 829, 833–34 (Tex.Sup.1967). See also *Concord Oil Co. v. Alco Oil and Gas Corp.*, 387 S.W.2d 635, 639–41 (Tex.Sup.1965); *Ybanez v. Anchor Constructors, Inc.*, 489 S.W.2d

730, 735–36 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.). The representations plus the execution of the Traylor confirmation form comprised a promise by Davis that Traylor would purchase the Grays' cotton. When Atkins learned of this promise that had been made in Traylor's behalf, it was his duty under the circumstances to take reasonable steps to notify the Grays of the true facts. Any detrimental change of position on the part of the Grays in reliance upon Traylor's failure to speak would thus estop Traylor from denying Davis' authority. *Cooper Petroleum v. LaGloria Oil and Gas Company*, supra. See Restatement (Second) Agency § 8E. See also *Champlin Oil and Refining Company v. Chastain*, supra; *A. R. Clark Investment Company v. Green*, supra; *Johnson v. Sovereign Camp, W.O.W.*, supra; and *Burnett v. Atteberry*, supra.

The duty to speak did not arise until someone at Traylor received actual knowledge of the Grays' belief that the Traylor confirmation of purchase form was a valid reflection of an oral commitment by Traylor. At that moment, failure to warn the Grays resulted in their continued belief in the supposed contract. As in *Cooper Petroleum v. LaGloria Oil and Gas Company*, supra, the misleading silence caused the Grays to rely on a non-existent promise and to make no effort to reopen negotiations with Bigham or any other buyer. We do not agree with Traylor's point of error 7 claiming Traylor had no duty to warn. Point 7 is overruled.

■ We conclude that the elements of estoppel by silence have been met and that Traylor is estopped to deny Davis' authority due to its own negligent failure to warn the Grays of the true situation when Traylor, through Buster Atkins, learned that Davis had used the Traylor form and the Grays believed they had a firm contract to sell their 1974 cotton crop to Traylor for 78¢ per pound. Appellant's points 2–5 complaining of a finding of apparent authority in special issue 10 and reliance upon apparent authority in special issue 11 are overruled.

In summary, fraudulent misrepresentations were made by Davis to the Grays. These fraudulent representations were reasonably believed, were relied upon, resulting in the Grays' changing their position to their detriment and damages. Traylor is liable because it failed in its duty to warn and is thereby estopped to deny that it clothed Davis with sufficient indicia of authority to make him its apparent agent, or indeed, its actual agent. Traylor's estoppel to deny Davis' authority results in making Traylor a participant in the fraud perpetrated by Davis. Because Davis was acting primarily for Palmetal when he decided to pay part of the purchase price himself and devised a flexible agreement with a maximum 75¢–3¢ split between Traylor and Palmetal, he cannot be said to have made the misrepresentations in the scope of his agency relation with the Grays.

■ In points of error 28–32, Traylor asserts there is no evidence, insufficient evidence, or the answer is against the great weight and preponderance for special issues 17 (whether the Grays failed to inquire if their cotton had in fact been sold), 21 (whether the Grays' failure to insist that Davis return a fully signed copy of the confirmation was negligence), and 29 (the earliest date when the Grays, using reasonable diligence, would have discovered that Traylor had not bought their cotton). All of these issues concern contributory negligence on the part of the Grays. In effect, Traylor contends that the Grays failed to inform themselves of the true situation, and that this failure negates their liability based on Atkins' failure to warn. Since contributory negligence is an affirmative defense, Traylor had the burden of proof. We, therefore, interpret his point of error as complaining that contributory evidence was established as a matter of law, or in the alternative, as against the great weight and preponderance of the evidence. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960).

■ The Grays testified they did not inquire whether their cotton had actually been sold because they believed the sale

was complete at the time of the oral agreement, that Davis said he would have a signed copy at the gin as in previous years, and they had no reason to distrust Davis. But in special issue 17, the jury determined that the Grays had not failed to make such inquiry. The only testimony indicating the Grays had made inquiry came from Davis who related an incident about a week to 10 days after the confirmation form was signed, when he said he met Jimmy and Sterling Gray on a road while driving in opposite directions. Davis stated that both he and the Grays slowed down, the Grays asked if the contract had come back from Lubbock, Davis answered in the negative, and then each drove on due to the press of oncoming traffic. The Grays deny this incident ever occurred. The response to the Grays' inquiry would not necessarily communicate to the Grays that Traylor refused to sign—merely that it was not signed and returned to Davis within a week or 10 days. This conflict in testimony was resolved by the jury in favor of finding that inquiry was made, and the jury therefore did not answer issues 18 and 19 inquiring into negligence, proximate cause, and damages conditioned on an affirmative answer to special issue 17.

We cannot say that the jury's resolution of this conflict is so against the great weight and preponderance of the evidence so as to be clearly wrong. In any event, we believe the Grays were not effectively alerted so as to cause suspicion, and past dealings between the parties permitted them to reasonably believe that Davis had negotiated a firm commitment from Traylor. Points 28 and 29 are overruled.

Points 30 and 31 assert that the jury's answers to special issue 21 was error. In special issue 21 the jury found the Grays' failure to insist that Davis return to them a copy of the confirmation form signed by Traylor was not negligence. Traylor in order to show that this failure was contributorily negligent, needed to prove that farmers in similar situations insisted on a receipt of a fully signed contract. The testimony from Carl Hensz, Bill Gray and Ray Gray,

all area farmers who dealt with Palmetal, shows they did not receive a copy signed by Traylor. None of them insisted that Davis send them a copy of the contract rather than keeping it at the gin. There was no testimony from other farmers dealing with Palmetal or other gins to show they insisted on personal receipt of a signed copy. We hold that the Grays were justified in relying on Davis' oral representations. Traylor failed to carry its burden of proof in its effort to show contributory negligence by means of the Grays' failure to insist on receipt of a fully signed copy of the confirmation form. Points 30 and 31 are overruled.

In points 32 and 33, Traylor complains of the answer to special issue 29 in which the jury found that the earliest date the Grays by use of reasonable diligence would have discovered Traylor had not purchased their cotton was July 13, 1974. In a stipulation, it was agreed by all counsel that the Grays were told on July 13, 1974 that the contract would not be honored. Traylor contends the Grays could easily have discovered the truth at an earlier date. While it is true that they could have done so, the evidence shows that they had no reason to suspect any problems with the contract, and therefore did not fail to use reasonable diligence under the circumstances. Points 32 and 33 are overruled.

In point of error 34, Traylor urges reversal due to the admission of testimony by Jimmy and Sterling Gray that Davis explained his failure to inform them of the truth because he had received advice from Atkins and Idris Traylor to hold onto the confirmation form. Traylor objects that such testimony was hearsay as to it and that these statements by an alleged agent cannot be admitted to prove agency. The trial court admitted the testimony on the assumption that additional evidence would be forthcoming to prove agency. Since we have held that Traylor is estopped to deny Davis' agency, such testimony was admissible as an admission by a party. Even if improperly admitted, however, this testimo-

ny was not significant for a finding of agency and cannot be said to have caused an improper verdict. Rule 434, T.R.C.P. Point 34 is overruled.

An injured party is entitled to recover in a tort action such damages as result directly, naturally and proximately from fraud. *Maddox v. Worsham,* 415 S.W.2d 222, 226 (Tex.Civ.App.—Amarillo, 1967, writ ref'd n.r.e.); *El Paso Development Company v. Ravel,* 339 S.W.2d 360, 364 (Tex.Civ.App.—El Paso, 1960, writ ref'd n.r.e.). The general measure of damages is the amount with which the plaintiff parted less the value of what he received. *Morriss-Buick Co. v. Pondrom,* 131 Tex. 98, 113 S.W.2d 889, 890 (Tex.Comm'n App.1938, opinion adopted); *George v. Hesse,* 100 Tex. 44, 93 S.W. 107 (1906); *Success Motivation Institute, Inc. v. Lawlis,* 503 S.W.2d 864, 867 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.). This does not give the defrauded party the benefit of his supposed bargain, but compensates him for actual pecuniary loss.

The amount of damages attributed to Atkins' negligence were determined by the jury in special issue number 9, which asked

"What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate the Grays for the pecuniary loss, if any, proximately caused by such negligence?

Answer in dollars and cents or 'none'.

We, the Jury, answer: $77,353.78"

Traylor objected to special issue 9 on the following grounds: (1) it was not supported by the pleadings, (2) and (3) there was no evidence or insufficient evidence to warrant its submission, and (4) it utilized the expression "pecuniary loss" which is not in common use nor defined or explained to the jury. There was no objection to the broad nature of the issue which encompassed the elements of proximate cause and pecuniary loss. Issues may be submitted broadly under Rule 277, T.R.C.P. combining elements or issues.

On appeal, Traylor complains that special issue No. 9 is not supported by the pleadings, and that the jury's finding of pecuniary loss cannot support a judgment due to insufficient evidence and use of an improper measure of damages.

In their pleadings the Grays alleged the best price for which they could sell their cotton at harvest time in July and August of 1974 was 46¢ per pound. In a trial amendment they additionally alleged the market price of cotton during the same period was 46¢ per pound. Traylor objected to the trial amendment on the basis of surprise. The court overruled the objection, but offered to consider a request for delay after the Grays rested their case if Traylor desired time to meet this new pleading. Traylor expressly waived a recess. Point of error 20 complaining that evidence of market price supplied by Atkins and Fred Traylor was not supported by the pleadings is overruled because of the trial amendment.

When the fraudulent misrepresentations were made by Davis and communicated to Traylor, the advance contract price was 75¢ per pound. In reliance on Davis' misrepresentations, the Grays gave up the opportunity to sell their crop to any buyer at the current market price. They received what appeared to be a binding contract, but was in fact a worthless piece of paper in the eyes of both Davis and Traylor. The damages naturally flowing from the negligent failure to warn (which we have previously concluded estops Traylor from denying Davis' authority to act as its agent) is the actual loss measured by value of the crop at the time of the act diminished by the value of the crop at harvest time when the fraud was discovered.

Traylor urges that specific jury findings of contract price and of market price at time and place of delivery are essential to any proper measure of damages, which he asserts is the difference between contract price and market price at the time and place of tender. The contract

price is not controlling. It is the actual value of the crop when the misrepresentations were made; not the value stated in the false representations. See *George v. Hesse,* supra. The evidence reveals the market for 1974 cotton under advance contract was 75¢ per pound at the relevant time and that it never exceeded this amount. The jury found in special issue 16 that the market value of the Grays' 1974 crop at Harlingen, Texas, at the time and place of signing the confirmation of purchase was 75¢ per pound.

The fraud was discovered at harvest time, as found in special issue 29. Purchases at that time of year were not on advance contract, but on actual baled cotton. The Grays' crop was processed into bales suitable for selling during July and August of 1974. Accurate assessment of market value during July and August of 1974 was difficult because most cotton had been advance contracted or was being held by farmers. Willing buyers and sellers seldom agreed on a price because of the generally low prices. Expert testimony was based on knowledge of the market in general and on sales of which the witnesses had personal knowledge.

Traylor contends all testimony regarding market price is irrelevant to any proper measure of damages because the willing seller element in the legal definition of market price is missing, and because it speaks only to sales of other crops and does not assess the value of the Grays' crop. We believe the testimony is competent to establish a market price in July and August. The scarcity of sales does not prevent computation of market price. Cotton was being sold during that time. There is no evidence to indicate buyers were forced to buy or farmers were forced to sell. Those who had not advance contracted had an alternative, as indicated by the action of the Grays who did not sell their crop immediately, but placed it in a government loan.

A number of quality characteristics affect the value of processed cotton. Paul Bruce, manager of Elrod Gin who ginned the Grays' 1974 crop, testified that the Grays' cotton did not fall below any quality specification so as to adversely affect the price except micronaire measurement. He stated that their cotton, compared to cotton with acceptable micronaire readings, *would* be discounted 1.25¢ per pound. Expert testimony of the price of cotton not subject to a quality discount was provided by Atkins, Fred Traylor, and Vernon Murphy, a cotton broker. Only Atkins and Murphy were asked to separate the harvest time price into July and August components. The maximum and minimum ranges were 54¢ to 55¢ for July and 46¢ to 50¢ for August.

In special issue 9 the jury calculated the amount of pecuniary loss to be $77,353.78, which we find to be supported by the evidence. The Grays, however, calculated this amount to exceed the maximum amount supported in the evidence by $1,295.52. Upon acceptance of the Grays' remittitur, judgment was entered against Traylor for $76,058.26. The greatest damages supportable by the evidence are computed by using the difference in market value when the contract was signed and the lowest market value at harvest time, discounted by a 1 ¼¢ per pound due to high micronaire content. These figures are:

```
321,792 total pounds @75¢ per pound              $241,344.00
212,114 pounds in July
        @(54¢ - 1 1/4¢ per pound)   $111,890.13
109,678 pounds in August
        @(46¢ - 1 1/4¢ per pound)   $ 49,080.90

Minimum value of harvested crop                   160,971.03

Maximum loss supported by the evidence           $ 80,372.97
```

We conclude that both the jury finding and the judgment are within the amount of damages supported by the evidence.

Traylor contends these prices do not prove market price because they are not shown to relate specifically to the Grays' crop. But the witness who was familiar with the Grays' cotton (Paul Bruce) stated their cotton was subject to discount on only one quality characteristic, high micronaire content. In all other respects it met the quality demands of buyers. Murphy and Atkins supplied testimony of the price of non-discounted cotton. Taken together, this evidence is sufficient to establish a market price applicable to the Grays' cotton.

■■ Finally, we do not agree with Traylor's contention that a specific jury finding of market price at time and place of delivery is essential. This tort recovery based on actual loss can be calculated as a difference in value of the crop at the commencement and conclusion of the fraud. See *Morriss-Buick Company v. Pondrom*, supra, and *George v. Hesse*, supra. As stated above, Traylor did not object to the broad form of the question, and any complaint regarding the form or substance of the special issue is waived. *Allen v. American National Insurance Company*, 380 S.W.2d 604, 609 (Tex.Sup.1964); *Lanphier Construction Company v. Fowco Construction Company*, 523 S.W.2d 29, 35 (Tex.Civ. App.—Corpus Christi 1975, writ ref'd n.r. e.); Rules 272, T.R.C.P. The answer of the jury and the amount of the judgment are supportable using a proper measure of damages. Traylor's points of error 16 through 24 regarding damages are overruled.

■ Appellant in his final point of error seeks indemnity and in the alternative contribution from Palmetal. Article 2212, Tex. Rev.Civ.Stat.Ann. (1971), states:

"Any person against whom, with one or more others, a *judgment is rendered in any suit on an action arising out of, or based on tort*, except in causes wherein the right of contribution or of indemnity . . . exists under the common law,

shall, upon payment of said judgment, have a right of action against his codefendant . . . ."

Therefore, where there exists a right of indemnity under the common law there is no right of contribution under Art. 2212, Tex.Rev.Civ.Stat.Ann. (1971). *Strakos v. Gehring*, 360 S.W.2d 787 (Tex.Sup.1962).

■ Under the common law doctrine of "active versus passive" negligence there is a right of indemnity for the secondary or passive wrongdoer. The general rule of this doctrine is that where two parties are liable to another for tort, the one by construction of law on account of some omission of a duty of protection or care owed and the other because he is the active perpetrator of the wrong, the right of indemnity may exist in the one whose wrong was only a secondary one. *Strakos v. Gehring*, supra; *Coastal States Crude Gathering Company v. Williams*, 476 S.W.2d 339 (Tex. Civ.App.—Corpus Christi 1971, writ ref'd n.r.e.); *South Austin Drive-In Theatre v. Thomison*, 421 S.W.2d 933 (Tex.Civ.App. 1967).

■ We have specifically found that the action of Davis toward the plaintiff constituted fraud. We have further held that Traylor is liable for the acts of Davis because it was aware of the Grays' detrimental reliance upon Davis' authority to act for Traylor. We have, therefore, two acts of negligence resulting in injury to the plaintiff. One act constitutes the active, perpetrated fraud (Davis' misrepresentation) and the other constitutes an omission of a duty of care owed (Traylor's failure to speak). This situation clearly falls within the common law concept of "active versus passive negligence". Therefore, appellant Traylor has no right of contribution under Art. 2212, but is entitled to full indemnity from Palmetal for the judgment entered.

The judgment is reformed to order Palmetal to indemnify Traylor for the amount of Traylor's liability to the Grays. The judgment of the trial court, as reformed, is affirmed.

## OPINION ON MOTION FOR REHEARING

Subsequent to our rendition on January 6, 1977, of our original opinion in this case, Traylor, appellant-defendant, filed its motion for leave to file an amended brief containing the name of "Wendell Davis" along with the other names of individuals comprising the partnership of Palmetal Gin Company.

 The name "Wendell Davis", together with the names of the other partners, was contained in the trial court pleading and the judgment. Appellant says, however, that the name of "Wendell Davis" was inadvertently omitted from its original brief filed with us. Consequently, in our original opinion we did not include that name either. We did include in our opinion, however, the names of Major Davis, Dan A. Davis, G. Wayne Davis and Jean E. Kirkland, Jr., being the names of all the other partners. Neither Palmetal nor any of its partners has replied to this motion.

Rule 431, T.R.C.P., provides in part:
"Briefs may be amended or supplemented at any time when justice requires . ."

Even after submission and rendition of its opinion, an appellate court may still grant leave to file an amended brief. *Minneapolis-Moline Company v. Purser*, 361 S.W.2d 239 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.). In accordance with those principles and the facts of this case we therefore grant appellant's motion for leave to file its amended brief.

Then Traylor in its motion for rehearing requests, among other things, that we reform the judgment of the trial court, and so modify our opinion, to order indemnity in favor of Traylor against Major Davis, Dan A. Davis, G. Wayne Davis, Wendell Davis and Jean E. Kirkland, Jr., individually and d/b/a Palmetal Gin Company, jointly and severally for the amount of Traylor's liability to the Grays and to order indemnity in favor of Traylor against those individuals for one-half of the costs of this appeal. We grant Traylor's request.

Accordingly, we now reform the judgment of the trial court to order Palmetal and its partners, including Wendell Davis, to indemnify Traylor for the amount of Traylor's liability to the Grays, as requested by Traylor. Also costs of this appeal are taxed one-half to Palmetal and its partners and one-half to Traylor.

Traylor's motion for rehearing is in all other respects overruled.