FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellant,

v.

TEXARKANA NATIONAL BANK, Defendant–Appellee.

No. 88–2216.

United States Court of Appeals, Fifth Circuit.

June 2, 1989.

As Amended on Grant of Appellant's Petition for Rehearing July 19, 1989.

Appellee's Petition for Rehearing Denied July 19, 1989.

Rehearing En Banc Denied July 19, 1989.

T. Ray Guy, Cathy Gribble Ries, David B. Dyer, Dallas, Tex., for plaintiff-appellant.

Randall D. Goodwin, James N. Haltom, Hubbard, Patton, Peek, Haltom & Roberts, Texarkana, Tex., for defendant-appellee.

Before WILLIAMS, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This action arose out of the closure and forced receivership of Guaranty Bond State Bank (GBSB). The Federal Deposit Insurance Corporation (FDIC) brought suit for breach of contract against Texarkana National Bank (TNB) to honor amounts alleged to be due to GBSB under two certificates of deposit, three loan participation agreements, and an Automatic Teller Machine (ATM) Agreement. TNB asserted by way of an affirmative defense that it had properly set off these liabilities against a number of liabilities of GBSB owing to it. TNB also counterclaimed for additional fees arising under the ATM Agreement. The district court found in favor of TNB on all counts.

## I. Facts and Prior Proceedings

On July 27, 1982, GBSB was declared insolvent by the Texas Commissioner of Banking. The FDIC was appointed receiver on July 28, 1982. The following day, a purchase and assumption transaction was effectuated under which the FDIC as receiver (FDIC Receiver) transferred certain assets of GBSB to a newly-organized bank, First Bank & Trust Company of Redwater, Texas, (FBTC) in exchange for the assump-

tion of certain other liabilities of GBSB. The assets of GBSB not transferred to FBTC were transferred to the FDIC in its corporate capacity (FDIC Corporate) in exchange for $11,640,300, which was then passed on to FBTC.

The assets transferred to the FDIC Corporate included the claims asserted against TNB in this litigation. The claims consisted of: (1) two TNB certificates of deposit, each in the amount of $100,000, purchased by GBSB on March 25, 1982 and maturing September 25, 1982; (2) GBSB's proportionate share of collections on three loans originated by TNB, attributable to GBSB's $100,000 participation in such loans; and (3) the unused portion of a $35,000 fee paid by GBSB to TNB at the inception of the five-year ATM agreement.

TNB defended by asserting that it no longer owed any money on these claims because it had exercised a setoff on August 3, 1982, effective on July 27, 1982.[1] It based the setoff on the following obligations owed to it by GBSB: (1) two $100,000 participations purchased in fictitious loans purportedly made by GBSB to Adam Bell and Cecil Gunther; (2) ten GBSB subordinated debentures, in the aggregate amount of $100,000, purchased by TNB in 1977, that matured in 1984; and (3) participations aggregating $317,120.23 in fifteen legitimate loans made by GBSB.[2] It further counterclaimed asserting that additional money was owed under the ATM agreement.

TNB also asserts it was entitled to its share of the proceeds collected from the FDIC's purchase at a trustee's sale of a deed of trust securing a loan made by GBSB to TexArk Enterprises (TexArk). After default on the loan, the FDIC purchased the real estate securing the loan at the substitute trustee's sale for $75,000, the amount of the loan outstanding. It later sold the property to a third party for $70,000, offering TNB its proportionate share of the actual cash proceeds received less costs of the sale. TNB refused, asserting that its share should be based upon the $75,000 purchase price at the trustee's sale.

On February 8, 1988, the district court entered its Memorandum Opinion and Order adopting almost verbatim the contentions of TNB. The judgment granted TNB all relief sought while denying any relief to the FDIC. It awarded TNB certain sums for "unpaid ATM service fees and for TNB's share of the supposed proceeds of foreclosure on collateral securing the TexArk loan." The FDIC followed with this appeal.

Specifically, the FDIC urges reversal of the district court's findings that: (1) the Bell and Gunther loans were fictitious, and that various misrepresentations were made to induce TNB's purchase of participations in them, making setoff appropriate; (2) the setoff of the subordinated capital debentures was appropriate because the FDIC had consented and because they were due and owing at the time of insolvency; (3) the ATM fee of $35,000 was a one-time, non-refundable fee, rather than one that should be prorated over the five year term of the agreement; (4) additional fees were owing under the ATM agreement; and (5) the FDIC was obligated to pay to TNB its proportionate share of the TexArk loan based upon the $75,000 proceeds from the trustee's sale.[3]

---

1. TNB by letter informed the FDIC of this setoff on August 5, 1982.

2. On appeal the FDIC does not dispute the portion of the judgment that rests on the setoff of the amounts of the legitimate loans in which TNB had participating interests because the FDIC has in fact collected on those loans. FDIC would have remitted to TNB their participation interest if TNB had not already helped itself by the setoff; thus, the point is moot. The FDIC, however, does not acquiesce in the district court's ruling that the setoff was proper.

3. The district court also found that the FDIC consented to the entire setoff by TNB through the actions of James Duval, FDIC's field-liquidator-in-charge. The court found that Duval had apparent authority to consent for the FDIC and that his statements indicated consent. We need not address this finding because it is not determinative of any of the issues before us; however, we briefly address it. *See infra* note 7.

## II. *Standard of Review*

Rule 52 of the Federal Rules of Civil Procedure provides with respect to findings of fact made after a bench trial:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Fed.R.Civ.P. 52(a). " 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

As is the case here, however, we have shown caution in reviewing district court findings which are essentially verbatim recitals of the prevailing party's proposed findings and conclusions. As we stated in *Amstar Corp.*:

> While the "clearly erroneous" rule of Fed.R.Civ.P. 52(a) applies to a trial judge's findings of fact whether he prepared them or they were developed by one of the parties and mechanically adopted by the judge, "we can take into account the District Court's lack of personal attention to factual findings in applying the clearly erroneous rule."

615 F.2d at 258 (quoting *Wilson v. Thompson,* 593 F.2d 1375, 1384 n. 16 (5th Cir. 1979)). The Ninth Circuit Court of Appeals has similarly indicated that strict scrutiny of "rubber-stamped" findings is appropriate. *See Smith International, Inc. v. Hughes Tool Co.,* 664 F.2d 1373, 1375 (9th Cir.), *cert. denied,* 456 U.S. 976, 102 S.Ct. 2242, 72 L.Ed.2d 851 (1982).

## III. *Setoff as to the Fictitious Loans* [4]

The district court found setoff proper by TNB because the Gunther and Bell loans were based on fraud. The GBSB's officers induced TNB to participate in the loans with misrepresentations. The court found that the statements made by the president of GBSB that the signatures of Bell and Gunther on their respective loan documents, security agreements, and supporting documents were genuine and that the collateral had been personally inspected by the officers of GBSB were material and fraudulent. The court further found that TNB's reliance on the statements was justified making setoff before insolvency appropriate.

FDIC seeks to have the setoff invalidated under *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The statutory codification of *D'Oench, Duhme* at 12 U.S.C. § 1823(e) applies to an "agreement which tends to diminish or defeat the right, title or interest of the [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase...." TNB's asserted setoff tends to diminish FDIC's right to collect on the obligations it seeks to enforce against TNB. Thus, the question before us is whether the setoff is based on an "agreement" within the meaning of § 1823(e).

The meaning of "agreement" in the statute was clarified in *Langley v. Federal Deposit Insurance Corp.,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). In *Langley,* the Supreme Court applied § 1823(e) to bar the defense that a note which FDIC sought to enforce had been procured by fraud in the inducement. Recalling that *D'Oench, Duhme* itself dealt with a note whose maker "lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled," the Court reasoned:

> Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a coun-

---

**4.** Part III of the opinion reflects the views of Judge Higginbotham and Judge Smith. Judge Williams dissents to the application of the *D'Oench, Duhme* doctrine in an appended opinion.

terpromise (as in *D'Oench, Duhme*) or of the truthfulness of a warranted fact. *Langley,* 484 U.S. at ——, 108 S.Ct. at 402. We find no relevant distinction between this case and *Langley.* TNB seeks to set off these two loans on the ground that fraudulent representations by GBSB's officers induced TNB to participate in the fictitious transactions. As in *Langley,* those fraudulent representations were part of an "agreement" within the meaning of § 1823(e). TNB failed to get the representations in writing. Therefore, *D'Oench, Duhme,* as codified in § 1823(e), bars TNB from asserting a setoff based on those representations.

TNB cannot escape the statutory bar by arguing that it was the fictitious loans underlying the loan participation agreements that were likely to mislead bank examiners. Under the teaching of *Langley,* the unrecorded representations by GBSB officers are part of the agreement relevant to application of § 1823(e). By failing to get the representations in writing, TNB participated in an arrangement likely to mislead FDIC. That the agency was also misled by the fictitious underlying loans does not change the analysis.[5]

### IV. *The Setoff of the Subordinated Debentures*

◼ The district court found that TNB could setoff its ten subordinated capital debentures of GBSB in the total face amount of $100,000.[6] The court found that the FDIC had given prior consent; that the debentures were due and owing as a result of the insolvency; and that there was a mutuality of obligations between GBSB and TNB. The district court's findings are clearly erroneous as to these debentures for at least two reasons regardless of consent by the FDIC.[7] Equity generally pre-

---

5. While we need not address the FDIC's other arguments as to why setoff was improper since *D'Oench, Duhme* applies, we briefly note them. First, FDIC argues that setoff was improper because FDIC corporate's rights intervened to bar TNB's claim to the setoff. It further argues that rescission based on fraud was not a proper basis for setoff. Finally, as to the argument by TNB that the entire setoff was proper because of consent, *see infra* note 7.

6. The subordinated debentures, maturing on July 15, 1984, specifically provided as follows:
 The indebtedness of the Bank evidenced by the Capital Debentures shall be junior and subordinate to the obligations of the Bank to depositors and other creditors ... All obligations to depositors or creditors—except any expressly subordinated or made equal to the debentures—shall be paid in full before any payment shall be made on account of the principal or interest on the Debentures.

7. TNB argues that it was entitled to the offset because of consent by the FDIC. This issue is not relevant on appeal because as is discussed above, even assuming consent was properly given, TNB still does not prevail. We explain the issue briefly, however.
 Under 12 U.S.C.A. § 1828(i)(1), the FDIC clearly has the power to consent to a setoff. The Federal Banking Statute provides:
 No insured State non-member (except a District Bank) shall, without prior consent of the Corporation, reduce the amount or retire any part of its common or preferred capital stock, or retire any part of its capital notes or debentures.

12 U.S.C.A. § 1828(i)(1). The district court found that "by the acts of Duval, FDIC gave its prior consent to the setoff." This finding is clearly erroneous. The statement made by the field-liquidator-in-charge to officers of TNB suggesting that a setoff might be appropriate, simply stating "Have you considered a setoff?", is not enough to create consent. The statement was made when two officers of TNB visited Duval at the former offices of GBSB to discuss resolving the relations between former GBSB and TNB. The statement is more properly characterized as "food for thought."
 The court, among other theories, found consent based on Duval's apparent authority. This basis was clearly erroneous. Reliance on his statements was not reasonable. *See Wells Fargo Business Credit v. Ben Kozloff, Inc.,* 695 F.2d 940 (5th Cir.), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).
 The district court also found equitable estoppel and ratification by the FDIC of the "consent" given by Duval because of the FDIC's lack of any written objection until May. However, TNB failed at trial to show when the FDIC received notice of Duval's statements. From the record, the first evidence of notice was written notice of the setoffs totaling $495,873.12 by letter dated August 5, 1982. FDIC then informed TNB that it in no way consented to the setoff by written objection the following May. Any delay in this written response was not unreasonable, especially in light of the six-year applicable statute of limitations to bring a suit for damages. 28 U.S.C. § 2415(a). This delay does not constitute ratification or estoppel. *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d

vents a subordinated creditor from enhancing its claim at the expense of other creditors, and these debentures, as a matter of law, do not have mutuality of obligations with the debts owed by TNB to GBSB. We consider these two controlling principles in turn.

## A. Equitable Considerations

It is undisputed that an equitable right to setoff can arise when there are mutual debts, or that insolvency of one party may justify setoff by the other. Because this right is an equitable right, however, equitable considerations must come into play to limit the right where necessary. *Scott v. Armstrong*, 146 U.S. 499, 507, 13 S.Ct. 148, 150, 36 L.Ed. 1059 (1892). In cases such as this, where a party voluntarily agrees to a claim subordinate to those of other creditors, equity is better served by preventing a setoff which would enhance the claims of that creditor at the expense of other creditors with a higher priority. *Interfirst Bank Abilene v. FDIC*, 777 F.2d 1092, 1096 (5th Cir.1985). To allow setoff would defeat the priority protections afforded depositors and other creditors, defeating their expectations as well.

## B. No Mutuality of Obligations

Also, as a matter of law, the subordinated debentures do not meet the test of mutuality of obligations to make setoff proper. Setoff is justified only if the two claims or demands "mutually exist between the same parties." *Dallas/Ft. Worth Airport Bank v. Dallas Bank & Trust Co.*, 667 S.W.2d 572, 575 (Tex.App.—Dallas 1984, no writ).

In *FDIC v. de Jesus Velez*, 678 F.2d 371, 376 (1st Cir.1982), the court held that promissory notes executed by two individuals and payable to an insolvent bank and debentures of that bank purchased by the two individuals were not "mutually extinguishable" because the debentures were specifically made subordinate to the claims of all other depositors and creditors of the bank. Consequently, no setoff could be allowed. Similarly, in this case, the debentures cannot be made "mutually extinguishable" with the obligations of TNB to GBSB because of their subordinate quality.

TNB purchased these notes with full knowledge and notice of the terms thereof. It should not now be able to rely on an equitable remedy to place itself in a preferred position vis-a-vis other creditors and depositors of GBSB. We hold that the district court was in error in giving priority, whatever the claimed reason, to these subordinate obligations.

## V. The ATM Agreement Fee

### A. The Initial Fee

■ The district court concluded, as a matter of law, that the $35,000 fee paid by GBSB to TNB was for the initial right to participate in the ATM system in 1981 and that GBSB received full consideration therefor.[8] The fee was a one-time, non-refundable payment for the initial capital improvement costs that were necessary to put together the structure from which the ATM system could be operated.

When the settled rules of contract construction are applied, it is clear the district court's interpretation of the agreement was correct. Written contracts are interpreted primarily by looking to the language of the instrument in an attempt to ascertain the true intentions of the parties. *Universal*

---

754, 756 (Texas 1980) (for ratification, the principal must retain the benefit of an unauthorized act of his agent after requiring full knowledge). *See also Moody v. United States*, 783 F.2d 1244, 1246 (5th Cir.1986) (for equitable estoppel, detrimental reliance must be reasonable).

**8.** The ATM agreement provides:

4. Charges and Expenses. Participant shall pay the following charges and expenses as provided below:
(a) Initial Participation Fee—Participant shall pay to TNB, on or before November 1, 1981, the sum of $35,000 *for the initial right to participate* in the system in 1981, and for the term hereof with payment of other prescribed fees.... (emphasis added).

*CIT Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157–58 (1951). The record establishes that both parties understood the fee to be a one-time, non-refundable fee. GBSB is not entitled to any refund on the fee.

### B. *Other Fees Under the ATM Agreement*

The district court also awarded $12,-633.25 plus interest for other unpaid ATM service fees incurred by GBSB prior to June 28, 1982. The FDIC on appeal does not dispute this finding except to the extent that it asserts TNB sued the wrong party for recovery. The FDIC argues that even if the claim is valid, it is not recoverable against the FDIC Corporate, but against the FDIC Receiver. We find FDIC's argument without merit.

Under the case of *Interfirst Bank Abilene, N.A. v. FDIC,* 777 F.2d 1092 (5th Cir. 1985), this undisputed amount is properly set off in full as a contract claim against GBSB's contract claims against TNB.

### VI. *The Texarkana Loan Sales*

 TNB contests the amount owed to it under the TexArk loan participation agreement it purchased from GBSB around October 22, 1981. On or about March 1, 1983, the TexArk loan was in default and the FDIC Corporate, as successor-in-interest to GBSB, caused the property described in the deed of trust to be sold. The FDIC Corporate was also the purchaser at the sale.

By the terms of the TexArk loan participation agreement, GBSB and the FDIC Corporate agreed, in pertinent part, to the following:

[O]ur sole responsibility to you being ... to account to you for your pro rata share of the net amount of *all payments actually received* by us with respect to the said note. (emphasis added).

The FDIC purchased the TexArk property at the substitute trustee sale for $75,000, the amount outstanding on the loan. TNB claims that it is entitled to its pro rata share of this amount. TNB argues that when the FDIC purchased the property, proceeds were available for distribution, extinguishing the debt without deficiency. The district court agreed with TNB, finding the FDIC liable for $20,000, its pro rata share of the $75,000 figure. We must find to the contrary, looking to the substance of these transactions.[9]

The FDIC properly undertook to calculate the amount owed to TNB under the loan participation agreement using the figure of $70,000, the subsequent sale price to a third party of the property. The purchase by the FDIC at the trustee's sale was nothing other than a paper transaction. The evidence is undisputed that no money actually changed hands. Rather, the "purchase" represented a bookkeeping entry, cancelling the outstanding portion of the debt. Thus, no payment was "actually received" as required by the contract language until the third party sale. The district court was incorrect as a matter of law in its finding that the price at the trustee's sale was the correct figure to calculate the amount owed to TNB. *See Jefferson Sav. & Loan Ass'n v. Lifetime Sav. & Loan Ass.,* 396 F.2d 21, 22 (9th Cir.1968). The correct amount appears to be $18,669, 26.67% of the $70,000 received without deduction for sale expenses. The district court refused to deduct expenses in the trustee's sale from the amount owed to

9. We are not bound by the clearly erroneous rule but review and interpret the contract language *de novo* as a question of law. *Carpenters Amended & Restated Health Ben. Fund v. Holle-* *man Constr. Co.,* 751 F.2d 763, 766 (5th Cir. 1985). *See also, Austin v. Decker Coal Co.,* 701 F.2d 420, 425 (5th Cir.), *cert. denied,* 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

TNB, finding that the FDIC failed to prove the issue. This finding is not clearly erroneous in light of the vagueness and uncertainty of the evidence at trial. Moreover, the FDIC only raised the expense issue during oral argument. Arguments raised on appeal must be included in the appellate brief or they may be considered waived. *Franceski v. Plaquemines Parish School Board*, 772 F.2d 197, 199 n. 1 (5th Cir. 1985).

## VII. *Conclusion*

We reverse the district court's allowance of setoff as to the fraudulent loans and as to the subordinated debentures. Setoff was not appropriate on the loans because of the *D'Oench, Duhme* Doctrine. Setoff was not authorized as to the subordinated debentures. They were subordinate and equitable concerns and the fact that the debentures were not "mutually extinguishable" with the debts owed by TNB to GBSB require that the subordinate status be enforced.

As to the ATM agreement, we affirm the district court's finding that the initial fee was non-refundable and that GBSB received consideration thereof. We also affirm the award of the other fees under the agreement as owing by the FDIC Corporate.

As to the purchase at the trustee's sale by the FDIC and then subsequent sale of the TexArk property, we reverse the district court's use of the price at the trustee sale to determine the amount owed under the loan participation agreement. The correct figure was the subsequent sale price.

AFFIRMED IN PART; REVERSED IN PART.

JERRE S. WILLIAMS, Circuit Judge, dissenting in part:

### A. *Applicability of D'Oench, Duhme*

I respectively dissent to Section III. I find the application of the *D'Oench, Duhme* doctrine to these facts unwarranted and undesirable. The majority rests its holding on the assertion that this case is controlled by *Langley*, in which the doctrine was applied. I find, however, not only *Langley*, but also the typical *D'Oench, Duhme* case, clearly distinguishable from the facts of the case before us.

The *D'Oench, Duhme* doctrine typically applies where a person, usually a borrower, is a party to a transaction that has misled the FDIC. Such was the situation in *Langley*. A party to such a transaction can expect to be obligated to investigate the transaction thoroughly and responsibly. For cases involving the obligations of parties in such transactions, *see e.g.*, *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369 (5th Cir.1988) (borrowers "lent themselves to a scheme" under *D'Oench, Duhme* by failing to revoke unconditional guaranty covering future loans); *FDIC v. McClanahan*, 795 F.2d 512 (5th Cir.1986) (borrower signed blank promissory note); *FDIC v. Hoover–Morris Enterprises*, 642 F.2d 785 (5th Cir. Unit B, 1981) (borrower participated in unwritten side agreement which would defeat FDIC's interest in the loan).

In contrast, TNB "participated" in the loan only after it was made, and in no way participated in the underlying transaction. Just as did the FDIC, TNB came into the picture after the deceptive scheme was completed. The fictitious loan had already been made. In buying a portion of the loan after it was negotiated, TNB in no possible way contributed to the concealed deceptive scheme, unlike the debtor in *Langley*. The scheme was already complete. In *Langley*, the borrowers were the participants in the transaction that misled the FDIC. Not so was TNB.

Under 12 U.S.C. § 1823(e), which codifies *D'Oench, Duhme*, our analysis is the same. Unlike the majority, I find the relevant

"agreement[s] which tend to diminish or defeat the right" of the FDIC to be the fraudulent loans themselves. TNB only came into the picture after the fraudulent loans were made.

Banks, in the normal course of business, cannot be expected to investigate thoroughly for fraud totally concealed from them in loan participation agreements into which they enter. I find it hard to imagine a requirement that would tie up to a greater extent the normal day to day banking business in placing such loans with other banks. The majority view implies that a simple "boilerplate" written form that representatives were not fraudulent would be sufficient to satisfy *D'Oench, Duhme* and the statute. That kind of meaningless requirement would have added nothing at all to the clear proof in this case that TNB had no knowledge of fraud and that it was a banking transaction of utterly routine nature. I do not read *D'Oench, Duhme* nor the statute to establish an "I am my brother's keeper" relationship in arms length bank dealings so that a completely innocent bank is responsible for the concealed fraud of another bank. Yet this is what the majority view demands. I cannot accept that demand as the law.

Because I find *D'Oench, Duhme* inapplicable, the FDIC's counter arguments need to be addressed.[1] I discuss each in turn.

## B. *Rescission Based on Fraud As Grounds for A Setoff*

The district court found setoff proper by TNB because the Gunther and Adams loans were based on fraud. The GBSB's officers induced TNB to participate in the loans with misrepresentations. The court found to be material the statements made by the president of GBSB which were that the signatures of Bell and Gunther on their respective loan documents, on the security agreements, and on the supporting documents were genuine and that the collateral had been personally inspected by the

officers of GBSB. The material statements were fraudulent. The court further found that TNB's reliance on the statements was justified, making setoff before insolvency appropriate. This finding is not clearly erroneous.

In a case with similar facts we found setoff appropriate. *Interfirst Bank Abilene v. FDIC*, 777 F.2d 1092 (5th Cir.1985). *See also First Empire Bank v. FDIC*, 572 F.2d 1361, 1367–69 (9th Cir.1978), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). In *Interfirst*, the court held that a participating bank could set off against debts owed to a lead bank upon proving its claim of entitlement to rescission based on fraud. The participating bank (Interfirst) had purchased participations in four loans, two of which were fraudulent. After the lead bank was declared insolvent, the FDIC made a demand on Interfirst for funds held. The bank responded by exercising a setoff, and we affirmed.[2]

Interfirst was found to be entitled to a setoff because its claim was provable. A claim is provable if "(1) it exists before the bank's insolvency and does not depend on any new contractual obligations arising later; (2) liability on the claim is absolute and certain in amount when suit is filed ..., and (3) the claim is made in a timely manner, well before any distribution of the assets of the receivership other than a distribution through a purchase and assumption agreement." 777 F.2d at 1094. Interfirst asserted provability on two grounds, one of them being entitlement to rescission based on fraud. The court upheld Interfirst's actions under either of the bases argued, finding also the required "mutuality" of obligations making setoff appropriate. 777 F.2d at 1095.

As in *Interfirst*, TNB's claim for rescission based upon fraud predated the insolvency of GBSB and was absolute in amount. The fraud occurred at the time of the inducement to participate in the loans. TNB's claim was also made in a timely

---

**1.** *See* note 5 in the opinion of the Court.

**2.** FDIC concedes that there is an equitable right of setoff when there are mutual debts and that

the insolvency of one party may justify setoff by the other. *Scott v. Armstrong*, 146 U.S. 499, 507–08, 13 S.Ct. 148, 150, 36 L.Ed. 1059 (1892).

manner. As in *Interfirst,* while TNB did not seek rescission until the lead bank was declared insolvent, it did do so before the distribution of assets of the receivership. Thus, for TNB to have a right to rescission, the only issues left to address are the actual elements of the claim of fraud.

A party seeking rescission under Texas law must establish five elements: (1) that a false representation was made by a party with authority; (2) that the party making the representation was aware of its falsity; (3) that the representation was made with intent to induce the receiving party to take some action; (4) that the receiving party acted in reliance on the misrepresentation; and (5) that such reliance was detrimental. *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1171–72 (5th Cir.1982), *vacated on other grounds,* 460 U.S. 1013, 103 S.Ct. 1254, 75 L.Ed.2d 483 (1983). The district court correctly found from the evidence at trial, that the GBSB's president invented the two loans and presented them as legitimate to try to procure the participation of other banks. Even one of the FDIC's witnesses admitted that the loans were fictitious.

As to the reliance, both parties agree it had to be reasonable.[3] The FDIC asserts that TNB's reliance on the president's statements was not reasonable and that they should have researched the loans independently to determine their validity. The FDIC's assertions cannot stand. While it is true that a party is under a duty to exercise reasonable care and diligence in relying on statements of an adverse party, a defrauded party:

> is under no duty to make an investigation to discover the existence of fraud, unless and until he has acquired some knowledge of facts that would put a reasonable prudent person on inquiry.

*Traylor v. Gray,* 547 S.W.2d 644, 653 (Tex. Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). In *Traylor,* the parties had had prior business dealings. A "simple telephone call" would have led to the discovery of the fraud. The subject matter and method of dealing between the parties, however, was no different from previous transactions, making the reliance reasonable. *Id.* We are faced with the same situation here.

TNB had participated in at least fourteen other loan participations originated by GBSB with the same degree of inquiry and without problem. Each of the loans was valid and had been paid in its entirety. In fact, the testimony at trial showed that TNB used the same procedures in loan participations it had purchased with banks in Little Rock, Dallas, and other places, and that this practice was common among banks. TNB's practice depended upon the representations of the officers of other banks as to the validity of the documents for the particular loan transaction. Banks are entitled to assume "that when dealing with another bank in a commercial undertaking that bank is competent to conduct its own affairs." *See Barclays Bank D.C. O. v. Mercantile National Bank,* 481 F.2d 1224, 1235 (5th Cir.1973), *cert. dismissed,* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974). Thus, TNB's practice was reasonable.

The FDIC argues that the size of the Gunther and Bell loans, each $100,000, should have put TNB on notice that additional investigation was needed. The record, however, indicates that TNB purchased at least two other loans which were around the same amount as the two fraudulent loans and which were valid and subsequently paid. TNB had purchased participations in loans made to James C. Carlow in the aggregate amount of $88,000, and to Freeman Nurseries in the amount of $120,-000. There was nothing unusual in the size of the Gunther and Bell loan participation transactions that should have put a reasonable, prudent banker on notice of any irregularities, creating a duty of further inquiry. The representations by GBSB officers that the loans were genuine, and that the collateral existed and had been inspected, were

---

**3.** The FDIC claims that the district court as a matter of law erred by not entering a finding on reasonableness. The court did enter a finding that reliance was justified, however, which suffices as a finding of reasonableness.

made in the ordinary course of doing business and did not differ from other prior loan participation agreements between the parties. We conclude that the district court's finding of a right to rescission based upon fraud was not clearly erroneous.

### C. *Possible Intervention of FDIC Corporate's Rights to Bar TNB's Right to Set off the Fictitious Loans*

Finally, the FDIC argues that the rights of FDIC Corporate intervened to bar TNB's rights to a setoff as to the fictitious loans. Because setoff was proper as to the two fraudulent loans, however, it is only "the balance, if any, after the setoff is deducted, which can justly be held to form part of the assets of the insolvent." *Scott,* 146 U.S. at 510, 13 S.Ct. at 151. Thus, the FDIC Receiver had no assets represented by the Bell and Gunther loan participations because GBSB did not have the assets. So it could not convey them to the FDIC Corporate in the purchase and assumption transaction. Intervention by the FDIC Corporate as to these assets was impossible. It never had them.

In summary, I dissent because I would affirm the district court's finding that setoff was proper. The *D'Oench, Duhme* doctrine was not applicable, and the majority view sets up a grave and unjustified impediment to normal banking operations. Two further claims of the FDIC are without merit. They are, first, that FDIC Corporate's legal operations constituted a bar to TNB's right to setoff, and second, that the district court was in error in finding the right of TNB to rescind because of fraud.

